2020 IL App (1st) 172156
No. 1-17-2156
Opinion filed June 4, 2020

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12 CR 18726 (02) |
| DANIEL GUERRERO, | ) ) | The Honorable Matthew E. Coghlan, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Reyes concurred in the judgment and opinion.
Justice Lampkin specially concurred, with opinion.

**OPINION**

¶ 1       Defendant Daniel Guerrero was found guilty by a jury of first degree murder and sentenced to 45 years with the Illinois Department of Corrections (IDOC). On appeal, he claims (1) that certain remarks made by the prosecutor during the State's rebuttal closing argument constituted prosecutorial misconduct and (2) that his sentence is excessive when compared to the lesser sentence of a codefendant. For the following reasons we affirm his conviction and sentence.

¶ 2                                    BACKGROUND

¶ 3         On appeal, defendant raises no issues concerning the sufficiency of the evidence against him. We, therefore, summarize the evidence below.

¶ 4         The State's evidence at trial established that, on May 29, 2010, at midnight, a group of men, who belonged to the same gang, approached two men on a nearby street because one of the two men was wearing a red shirt, which was the color of a rival gang. One of the two men, Mario Gallegos, was able to escape, and he testified at trial as an eyewitness. The other man, Alan Oliva, who was wearing the red shirt, was beaten to death. Gallegos identified defendant as the first person to strike the victim. Gallegos testified that defendant swung a baseball bat at the victim, thereby knocking the victim to the ground, whereupon the other men beat and stabbed the victim until he stopped moving. The victim later died from his wounds.

¶ 5         After listening to closing arguments and jury instructions, the jury found defendant guilty of first degree murder. After considering factors in aggravation and mitigation, the trial court sentenced defendant to 45 years with IDOC. On July 11, 2017, defendant filed a timely notice of appeal, and this appeal followed.

¶ 6                                     ANALYSIS

¶ 7                                  I. Rebuttal Closing

¶ 8         Defendant argues that the State committed prosecutorial misconduct by making certain prejudicial remarks in its rebuttal closing.

¶ 9                                    A. Standard of Review

¶ 10        While the State has wide latitude in both its opening statements and closing arguments and may comment on the evidence, it is still improper for the State to make comments that have no other purpose than to arouse the prejudices and passions of the jury. *People v. McNeal*, 2019 IL App (1st) 180015, ¶ 43; *People v. Jones*, 2016 IL App (1st) 141008, ¶ 21. Even if the remarks were inappropriate, reversal is required only if they engendered substantial prejudice against the defendant such that it is impossible to tell whether the verdict of guilt resulted from them. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007); *McNeal*, 2019 IL App (1st) 180015, ¶ 43. If the reviewing court cannot determine whether the prosecutor's improper remarks contributed to the defendant's conviction, then it must grant a new trial. *Wheeler*, 226 Ill. 2d at 123; *McNeal*, 2019 IL App (1st) 180015, ¶ 43.

¶ 11        This court has applied, in different cases, both a *de novo* standard and an abuse of discretion standard when reviewing a prosecutor's closing arguments. *McNeal*, 2019 IL App (1st) 180015, ¶ 44; *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 39 ("[t]his court has noted confusion regarding the appropriate standard of review regarding alleged errors occurring during closing arguments"); see also *People v. Boston*, 2018 IL App (1st) 140369, ¶ 82; *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008) ("Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review."). An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the position adopted by the trial court. See, *e.g.*, *McNeal*, 2019 IL App (1st) 180015, ¶ 28. *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. See, *e.g.*, *McNeal*, 2019 IL App (1st)

180015, ¶ 29. In the case at bar, we need not resolve this dispute, because the outcome would be the same under either standard of review, as we explain below.

¶ 12                                    B. Forfeiture

¶ 13        Defendant concedes that he failed to object at trial to the instances of prosecutorial misconduct that he now alleges on appeal.

¶ 14        To preserve an error for appellate review, a defendant must both object at trial and raise the error in a posttrial motion; otherwise it is considered forfeited. *People v. Sebby*, 2017 IL 119445, ¶ 48; *McNeal*, 2019 IL App (1st) 180015, ¶ 82. Even if an error is forfeited, we may still review it under the plain error doctrine. *Sebby*, 2017 IL 119445, ¶ 48; *McNeal*, 2019 IL App (1st) 180015, ¶ 82. Under this doctrine, an error rises to the level of plain error if it is a clear or obvious error and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Sebby*, 2017 IL 119445, ¶ 48; *McNeal*, 2019 IL App (1st) 180015, ¶ 82. In the case at bar, defendant asks this court to consider the forfeited issues under the first, or closely-balanced, prong.

¶ 15        However, the first step of any plain error analysis is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49; *McNeal*, 2019 IL App (1st) 180015, ¶ 81. For the reasons explained below, we cannot find a clear or obvious error.

¶ 16                                    C. Expert

¶ 17        Defendant's first claim regarding the State's rebuttal closing is that the State improperly attacked the defense's expert witness.

¶ 18      At trial, the defense called Dr. Mary Maclin, a psychology professor, as an expert witness to testify generally about potential issues that could affect the reliability of an identification. After the State had an opportunity to *voir dire* the witness, defense counsel asked the court to qualify Dr. Maclin "as an expert in the field of memory and eyewitness identification." However, the court ruled that it would "allow the witness to testify as an expert in the field of memory." The court did not refer to eyewitness identification, and the defense did not object or follow up. Thus, Dr. Maclin was accepted as an expert in memory only.

¶ 19      During the State's initial closing argument, the State did not mention this expert. However, during the defense closing, the defense argued, "And there's not been one challenge from the state's attorney as to the science here." The State responded during its rebuttal closing, and it is the State's remarks in response that are at issue here. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 110 (the State "may respond in rebuttal to statements of defense counsel that noticeably invite a response"). Defendant quoted in his appellate brief the passages that he objects to, and we quote and discuss each one below.

¶ 20      The first remarks about the expert that defendant quotes are ones in which the prosecutor exhorted the jurors to still use their common sense:

> "[S]he thinks that she's got a lot of this stuff figured out what's going on up here of us. What we are able to do.
>
> And I will submit to you that they are in the baby form of that science about figuring it out. We all know through our life and this is where you get to use our common sense. The judge has told you, and I will tell you, your life experiences, you get to bring that to the jury and think about it.

And you will know from your life that things that happen that you are able to see, some of you are able to recognize them, you don't know what parts. You can't analyze it. You can't say it's because it's a distance between their eyes or their nose or anything like that specifically. That's going on in us. That's science has no clue about that. And I submit to you maybe a hundred years from now, they will get a better clue. But from this person that they brought in yesterday, this professor that they brought in, we didn't learn anything about science. Nothing was learned about that science."

See *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 61 (a party may argue that an expert's opinion is contrary to common sense and may exhort the jury to "use common sense" in assessing the expert's testimony). Defendant claims that, with the above remarks, the prosecutor was testifying as the State's own expert witness. However, in addition to exhorting the jurors to use their common sense, the prosecutor was building on what the defense expert had testified to. Dr. Macklin had testified that "one of the notoriously difficult things with faces is that they're really hard to describe." Based on this, the prosecutor argued that people identify faces without knowing exactly how they do it—without knowing if it is "the distance between their eyes." Although Dr. Maclin testified about factors that could adversely affect memory such as stress, weapon focus, passage of time, and night viewing, she did not testify about the neurology behind facial recognition or how we humans recognize faces. The prosecutor could be understood as arguing that the jurors had not learned anything "about that science"—namely, facial recognition—from this expert, which would be correct.

¶ 21    The next set of remarks regarding the expert that defendant quotes concerned the expert's own memory lapse on the stand and her payment for this case:

"She can't even remember what she is saying during the time she is talking about her field of specialty. Her field of pay me two hundred[1] dollars an hour to sit here. I hope they got a deduction for every time she forgot what the heck she was talking about."

Defense counsel did object to that last line, and the trial court overruled the objection. This was the only time that the defense objected during the State's rebuttal closing. Although the trial court did not explain why the objection was overruled, we observe that Dr. Macklin did, in fact, forget what question she was asked while in the middle of her response, several times, and actually poked fun at herself for doing it. During her direct examination, defense counsel had asked her to talk about "the passage of time and the forgetting curve." In the middle of her response, Dr. Macklin asked: "I'm sorry. I'm—Could you repeat—." When defense counsel reminded her that the question was about the forgetting curve, she remarked, "That's funny." At another point in her direct examination, she stopped in the middle of a response and said: "And I sort of forgot your question, if you could repeat it." And yet at another point in her direct examination, she again stopped in mid-response and said, "And I'm sorry, I'm getting a little—What was your question?"

¶ 22    As for her payment, when the prosecutor asked her on cross examination if having an "independent administrator" was important, she responded defensively that she did not "have a personal stake in this," despite expecting to receive $2400 for this case and having worked

---

[1]In his appellate brief, defendant quotes the prosecutor as stating "[h]er field of pay me two thousand dollars an hour to sit here." However, the transcript shows that the prosecutor actually stated two hundred dollars an hour which was, in fact, what the expert testified was her rate of pay.

for this defense counsel before. Both lines of comments, about forgetting and payment, stemmed directly from the expert's testimony. See *People v. Luna*, 2013 IL App (1st) 072253, ¶¶ 131-33 (we found no error in the prosecutor's argument that the expert was " 'motivated by money,' " where it was an attempt to establish the expert's possible bias and was drawn from the evidence); see also *People v. Hickey*, 178 Ill. 2d 256, 291 (1997) (the bias possibly created by an expert's payment is a proper subject for closing argument).

¶ 23        Defendant compares the prosecutor's comments in the instant case to the prosecutor's comments in *People v. Moss*, 205 Ill. 2d 139 (2001), and *People v. Griffith*, 334 Ill. App. 3d 98 (2002). In *Moss*, the prosecutor used phrases such as " 'psycho-babble' " (*Moss*, 205 Ill. 2d at 170) and " 'cash for trash doctors' " (*Moss*, 205 Ill. 2d at 170) to denigrate a defense expert. These remarks were made at a sentencing hearing where the defendant had received the death penalty. *Moss*, 205 Ill. 2d at 144, 169. Our supreme court found these phrases "unacceptable," but not reversible error. *Moss*, 205 Ill. 2d at 170-71.

¶ 24        In *Griffith*, the murder served as an aggravating factor which led the defendant to receive the death penalty in another case. *Griffith*, 334 Ill. App. 3d at 119-20. During closing argument, the prosecutor argued that defense counsel's argument would give the defendant a " 'license to kill' " and that the defense expert was " 'ridiculous.' " *Griffith*, 334 Ill. App. 3d at 119. Similar to our supreme court in *Moss*, the appellate court in *Griffith* found these remarks "unprofessional," but not reversible error. *Griffith*, 334 Ill. App. 3d at 119.

¶ 25        In the case at bar, the prosecutor did not call the expert "trash" or label her testimony "babble" or "ridiculous," although he did point out her own memory lapses and criticized the substance of her testimony, clearly hoping that the jury would draw its own conclusions. For

these reasons, and because *Moss* and *Griffith* both involved the death penalty, we find them distinguishable.

¶ 26    Immediately after the trial court overruled defendant's one objection, the prosecutor stated, "Which one of us here is going to rely on her for the science of the brain? I don't think any of you would." Defendant argues that it was improper for the prosecutor to use the word "us" because he was then aligning himself with the jury. In support, defendant cites *People v. Johnson*, 149 Ill. App. 3d 465, 468 (1986), where the appellate court found it improper for the prosecutor to "align[ ] himself with the jury by referring to 'our job' to find the facts." In the case at bar, while the use of the phrase "one of us" was inappropriate, the prosecutor quickly corrected the error in his very next sentence by replacing it with "any of you." Thus, any error was *de minimis* and harmless.

¶ 27    The third set of remarks about the expert that defendant quotes concerned mainly her alleged failure to write a report in this case:

> "How about this other part, she doesn't want to write a report. What does that tell you. She doesn't have any confidence to go and face it. If it is in science, it is the way it is. It can't be changed if it is in science. Write a report. Give a report to both sides and say and stand by it. That's what you're supposed to do.
>
> No. We are going to talk about it on the phone back and forth instead. I don't even know when I got these [police] reports about this incident. I don't even know when I went and charged him about this stuff. Comes up here and you want to rely on her memory. Are you kidding me.

She comes up there and she sits there before you and starts talking on and on about [memory] which maybe some of you were able to follow. G-d love you. Way more knowledgeable than I could.

I will talk real quickly about a couple of things that I did note that she talked about. She got cute names for it too, attention arousal relationship. And that's talking about the weapon, the weapon okay. She is talking about the weapon."

Defendant claims that the State denigrated the witness by using the word "cute." However, the prosecutor used the word "cute," not to refer to the witness, but to the name of the theory—which theory he did not disagree with. In fact, he went on to agree with the witness that, of course, if one's attention is drawn to one thing, then one may not notice something else. His point was, "Boy, you need science for that? That's our common sense." Again, he was exhorting the jurors to rely on their common sense, which he is allowed to do. *Gavin*, 2014 IL App (1st) 122918, ¶ 61.

¶ 28    As for the lack of a report, that was the subject of both *voir dire* and cross examination, particularly in light of the fact that the expert could not recall which police reports she had received and reviewed in connection with this case. Also, she could only "guess" at how many times she had previously been found qualified to testify as an expert, which she believed was at most 6 to 8 times in the 14 years that she had worked as a consultant and expert witness. She testified that she had never been found not qualified but there were "times my testimony wasn't allowed to be presented." The lack of a report was a legitimate subject of inquiry, and defendant does not cite a case to the contrary. Defendant does cite a case that found: "Unless predicated on evidence that defense counsel behaved unethically, it is improper for a prosecutor to accuse defense counsel of attempting to create

reasonable doubt by confusion, misrepresentation, or deception." *People v. Johnson*, 208 Ill. 2d 53, 82 (2003). However, unlike *Johnson*, the prosecutor's criticism in the case at bar was directed, not at defense counsel, but squarely at the expert and her inability to recall certain facts, which was exacerbated by the lack of a report.

¶ 29     The fourth set of remarks that defendant quotes related to how brightly-lit the streets of Chicago are:

> "It was dark out there. It was dark out there. Well, you know maybe in Iowa where it gets dark out, it is dark. Unfortunately, we don't see much darkness in Chicago because it is [*sic*] city lights. They are very bright. You saw it there on the corner. There is a city light right there."

The expert, who was a professor at the University of Northern Iowa in Cedar Falls, Iowa, testified generally about the problems with nighttime viewing. In closing, the prosecutor made a joke to hammer home a relevant point, namely, that the State's photos of the crime scene showed that there was a street light close by. Humor is not banned from closing argument. *C.f. McNeal*, 2019 IL App (1st) 180015, ¶ 77 ("An attorney may use a personal, or even make-believe, story to make a point during closing arguments.").

¶ 30     The fifth set of prosecutorial remarks that defendant quotes concerned an example that the expert had given:

> "And what's your example. You know when you come out of the movies and it's real dark and your eyes have to refocus, what does that have to do with this. What movie is she talking about."

During her direct examination, the expert had explained that we have cones in our eyes that allow us to see in color and that enhance our "sharp focus" and that we have rods that allow

us to see in black and white and that enhance our peripheral vision. She then provided the following example: "[W]hen you go into the movies and you're a little bit late and you can't see when you get in there and that's because your cones have to turn off and your rods have to turn on." In the above quote from the prosecutor, he mistakenly referred to the example as what happens when one leaves the movies, rather than when one enters. Thus, he appears to have inadvertently misstated the testimony. However, there was no objection to it, and it was a minor point in her testimony.

¶ 31　　　　The sixth set of prosecutorial remarks quoted by defendant concerned eyewitness certainty:

> "Oh, if you have any certainty in you about something, throw it out the window, I guess, because there is this magic carpet that says about certainly being stressed and if you did something during that time and you think during this stressful situation this is what happens, throw it out the window, because in her opinion it didn't happen."

¶ 32　　　　Under Illinois law, certainty is one of the factors considered to determine the reliability of an identification. To assess the reliability of an identification, our courts utilize the five factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), known as the *Biggers* factors: (1) the witness's opportunity to view the offender during the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of the witness's prior description of the offender, (4) the witness's level of certainty at the identification, and (5) the length of time between the offense and the identification. *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47 (citing *Biggers*, 409 U.S. at 199-200); *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 22 ("These are often referred to as the *Biggers* factors."). Thus, under Illinois law, certainty is one of the factors considered.

¶ 33      However, the expert in the case at bar testified that certainty is a weak factor:

"It may seem counterintuitive but the science shows that competency—competency—confidence is not related to accuracy. So you can have a very confident witness and they could still be wrong. Similarly you could have a witness that isn't so sure and they could be right. They are independent variables. There's a weak relationship but it's sort of like on a scale of one to ten, it's, like, a three. It's just not a very strong relationship between confidence and accuracy."

¶ 34      In a recent opinion, this court explained that, while our courts do "admit expert testimony" criticizing certainty as a factor, we also have not "reject[ed] a witness's expression of certainty as an appropriate factor in the reliability analysis," and we explained why. *Macklin*, 2019 IL App (1st) 161165, ¶ 31; see also *People v. Lerma*, 2016 IL 118496, ¶ 1 (the trial court abused its discretion when it denied the defendant's motion to allow expert testimony concerning the reliability of eyewitness identifications). "[R]ecent research has recognized a distinction between the reliability of lineup and in-court identifications[2] and concluded that expressions of certainty at the time of initial identification are a relevant indicator of accuracy." *Macklin*, 2019 IL App (1st) 161165, ¶ 32 (citing John T. Wixted & Gary L. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis*, 18 Psychol. Sci. in the Pub. Int. 10, 55 (2017)). [3] In sum, Illinois caselaw strikes a balance: on the one hand, allowing litigants to offer testimony from experts

---

[2] In the case at bar, Dr. Maclin did not distinguish between initial and subsequent in-court identifications in her discussion of certainty.

[3] The article found that: "According to the available data, the relationship between confidence and accuracy for an initial ID from an appropriately administered lineup is sufficiently impressive that it calls into question the very notion that eyewitness memory is generally unreliable." John T. Wixted & Gary L. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis*, 18 Psychol. Sci. in the Pub. Int. 10, 55 (2017)).

who minimize certainty as a factor; and, on the other hand, still keeping certainty as a factor in our reliability analysis.

¶ 35    As a result, the prosecutor did not need his own expert to argue for certainty as a factor.[4] He had our precedent behind him. In addition, it was the expert who testified about "the magic number." Dr. Maclin testified that "if you ever did take intro to psych, you might remember this term, seven plus or minus two, the magic number, that we've got a limited capacity for taking in information." Thus, we do not find persuasive defendant's criticism of the prosecutor's remarks about certainty.

¶ 36    The last set of prosecutorial remarks about the expert which defendant quotes were the following:

> "You know everything that the expert witness they presented, they are trying to tell you that your common sense, throw it out the window. The judge tells you, do not throw it out the window. The judge tells to you bring it in. Your life experiences are worth mountains, mountains of value, way more than the two hundred dollars an hour that that person would testify for."

Defendant claims that the prosecutor was arguing that the judge sided with him. Defendant claims this was prejudicial and cites in support *People v. Sprinkle*, 27 Ill. 2d 398, 400 (1963). However, in *Sprinkle*, it was the judge's own actions—the judge's own questions and comments—that were at issue. *Sprinkle*, 27 Ill. 2d at 403. Thus, *Sprinkle* is inapposite. Again, as we observed above, the expert's pay and exhortations to use common sense were both proper subjects of closing argument. See *Gavin*, 2014 IL App (1st) 122918, ¶ 61.

---

[4]Later, during cross examination, the expert testified that she was familiar with the "saying" that "what happened to me on that day will stay with me forever"; and, when asked whether she was "here to tell us that we were wrong about that," she said no.

¶ 37        Having considered every passage that defendant quoted and objected to in his appellate brief concerning the expert, we cannot find that these remarks constituted error, and they certainly did not rise to the level of clear and obvious error needed for the plain error doctrine. *Sebby*, 2017 IL 119445, ¶ 49; *McNeal*, 2019 IL App (1st) 180015, ¶ 81.

¶ 38                                    D. Jury Fears

¶ 39        Next, defendant claims that the prosecutor made remarks during his rebuttal closing to appeal to the jury's fear of gangs.

¶ 40        The trial court had admitted evidence of gang membership as evidence of motive because, without this evidence, it was completely inexplicable why a group of men would beat a complete stranger to death for wearing a red shirt.

¶ 41        This court previously addressed the relevance of gang-membership evidence to this case, when two of defendant's codefendants challenged its admission on appeal. Affirming the admission of this evidence in both appeals, we explained: " 'One of the purposes for which gang evidence is admissible is to "provide a motive for an otherwise inexplicable act." ' " *People v. Colon*, 2018 IL App (1st) 160120, ¶ 35 (quoting *People v. Villarreal*, 198 Ill. 2d 209, 233 (2001), quoting *People v. Smith*, 141 Ill. 2d 40, 58 (1990)) (Pablo Colon was a codefendant of defendant); see also *People v. Sams*, 2017 IL App (1st) 160869-U, ¶ 94 ("admissible to provide a motive for an otherwise inexplicable act" (citing *Smith*, 141 Ill. 2d at 58 ("admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act")) (Gary Sams was a codefendant of defendant).

¶ 42        "Although there is 'widespread disapproval that exists towards street gangs,' a defendant may not insulate the fact finder from the fact of his gang membership, despite prejudice toward it, if that fact is relevant to understanding the case." *Colon*, 2018 IL App (1st)

15

160120, ¶ 34 (quoting *People v. Gonzalez*, 142 Ill. 2d 481, 488-89 (1991)) (codefendant); *Sams*, 2017 IL App (1st) 160869-U, ¶ 93 (also citing *Gonzalez*, 142 Ill. 2d at 489 for the same point) (codefendant). Thus, we found:

> "While the gang testimony may have had a prejudicial, even horrifying, impact on the jury, it would be impossible to understand why this group of men would spontaneously exit a party and beat an innocent passerby to death without this evidence, in particular, the victim's wearing of the color red, which was the color of a rival gang." *Colon*, 2018 IL App (1st) 160120, ¶ 42 (codefendant); Sams, 2017 IL App (1st) 160869-U, ¶ 98 ("There is no question that the general nature of the beating was gang-related.") (codefendant).

¶ 43    In the case at bar, defendant criticizes the State for referring in its rebuttal closing to defendant "and his boys," for discussing their gang tattoos, and for arguing that what happened in this case was "insane." The prosecutor argued: "As insane as this is, this is what's going on, on the streets unfortunately. This is how insane it could be. You turn [a pitchfork tattoo] upside down and that's *** disrespect and that red [shirt] is disrespect." However, defendant does not argue on appeal that admission of this evidence was error, and this was the evidence in this case. It is "insane" that a man could be murdered for wearing a red shirt but that is what happened here.

¶ 44    Defendant next criticizes the prosecutor for arguing, "Latin Count K. Killer. Those are the guys out there." Defendant argues that this was a blatant appeal to the jurors to protect themselves from "the guys out there." The prosecutor's remark was a reference to the testimony of Officer Chris Chmelar,[5] who was qualified as an expert in Chicago street gangs

---

[5]The witness stated his first name as "Chris," not "Christopher."

and who testified that one of codefendant Ramirez's tattoos indicated that Ramirez was "a killer of a Latin Count." The Latin Counts were a rival gang, and Chmelar explained that, in the tattoo, the Latin Count symbol was "upside down" with the letters "LCK," which stood for Latin Count killer.

¶ 45    In support, defendant cites *People v. Fluker*, 318 Ill. App. 3d 193, 202-04 (2000), in which we found that the prosecutor's argument constituted reversible error.[6] In *Fluker*, the prosecutor argued in the State's rebuttal closing:

> " 'The only issue in this case is not is this a mistaken identity ***. The only issue is who do you want to control our criminal justice system? ***
>
> *  *  *
>
> *** Do you want *** the Four Corner Hustlers to control our society?' " *Fluker*, 318 Ill. App. 3d at 203.

The prosecutor's remark in the case at bar about "[t]hose *** guys out there" is simply not similar to the prosecutor's remark in *Fluker* that an acquittal was the same as a decision to let gangs " 'control our society.' " See *Fluker*, 318 Ill. App. 3d at 203.

¶ 46    Defendant also claims that the following remarks constituted misconduct:

> "You know when you hear [defendant's] statements to the officers and you see it on a video, it's incredible. Incredible about how [defendant] continuously says, I mean, honest to God's truth, honest to God's truth. How many times did you hear that when [defendant] said, honest, officer. Honest. he throws around God all the time.

---

[6] This court observed: "The trial court exacerbated the error by overruling defendant's prompt, appropriate objections." *Fluker*, 318 Ill. App. 3d at 203. Thus, unlike the case at bar, the remarks in *Fluker* were preserved for our review in a case that we described as presenting "a very close question." *Fluker*, 318 Ill. App. 3d at 204.

You know when he is not our boy, the little devil with the pitchfork [tattoo], he throws around honest to God's truth, Honest. There is no honesty coming from him at all about what he did on that night."

Defendant argues that the prosecutor's references to "God" were an attempt to stir religious feeling and compares them to the remarks of the prosecutor in *People v. Quiroz*, 257 Ill. App. 3d 576, 584-85 (1993), which were found to be improper, although harmless. In *Quiroz*, the prosecutor had argued concerning the defendant's gang, the Satan Disciples, as follows:

" 'Now, ladies and gentlemen, it's a little ironic that a disciple of Satan would come into this courtroom—

* * *

—and tell you or ask you to find him guilty of second degree murder and not first degree murder because he was acting out of passion. The word "[p]assion," ladies and gentlemen, comes from the word of the suffering of Christ between the Last Supper and the following day. [A] Disciple of Satan wants to hide from that.' " *Quiroz*, 257 Ill. App. 3d at 584.

The remarks quoted above from *Quiroz* are readily distinguishable from the remarks at issue here. The remarks in *Quiroz* were an extended discussion of Christian theology that was entirely unrelated to the facts of the *Quiroz* case. *Quiroz*, 257 Ill. App. 3d at 585 (finding "particularly" improper "the prosecutor's comments regarding the Passion of Christ"). By contrast, in the case at bar, the original references to "God" were made—not by the State— but by defendant, when he was talking to the officers. The prosecutor was quoting defendant's statement, which was in evidence. See *Quiroz*, 257 Ill. App. 3d at 585 (criticizing the prosecutor for "denounc[ing] the defendant by drawing upon religious

imagery" when it had "no relevance to the facts of the case"). Thus, *Quiroz* is inapposite to the case at bar.

¶ 47     For the foregoing reasons, we do not find persuasive defendant's arguments about the prosecutor's rebuttal closing.

¶ 48                                   II. Sentencing

¶ 49     Lastly, defendant claims that his sentence is excessive when compared to a codefendant's sentence.

¶ 50     Defendant acknowledges that he failed to raise this issue about allegedly disparate sentencing in the court below and thereby forfeited it for our review. "In order to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Harvey*, 2018 IL 122325, ¶ 15. Although defendant filed a postsentencing motion to reconsider sentence, he did not set forth the alleged disparity with his codefendant as a ground for reconsideration. As a result, he asks us to review this claim either pursuant to the plain error doctrine or as ineffective assistance of counsel for counsel's alleged failure to object. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007) (plain error doctrine). However, either ground would require a finding of error. *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47. The first step under the plain error doctrine is considering whether a plain or obvious error occurred (*Harvey*, 2018 IL 122325, ¶ 15); similarly, if the trial court did not err, then counsel did not render ineffective assistance by not objecting (*Hensley*, 2014 IL App (1st) 120802, ¶ 47 (where there is no plain error, there is no ineffectiveness of counsel)). Since we find no error as explained below, neither ground applies.

¶ 51    The trial court has "broad discretionary powers" in sentencing a defendant. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A trial court's sentencing decision receives substantial deference on review, since "the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. In crafting a sentence, the trial court must balance "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 61. However, a defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense. *People v. Reed*, 2018 IL App (1st) 160609, ¶ 62.

¶ 52    When a trial court imposes a sentence within the permitted statutory range, a reviewing court will start with the presumption that it is proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. Generally, a reviewing court will disturb a sentence "only if the trial court abused its discretion in the sentence it imposed." *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). A trial court abuses its discretion in sentencing when the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Our supreme court has cautioned that a reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53 (1999).

¶ 53    Our supreme court has found that fundamental fairness requires that "similarly situated" codefendants, who were involved in the same crime, should not "receive grossly disparate sentences." *Fern*, 189 Ill. 2d at 58; see also U.S. Const., amend. XIV (due process

clause); Ill. Const. 1970, art. I, §§ 2, 11 (due process and proportionate penalties clauses). An "improper sentence disparity" may occur when "equally culpable defendants with similar backgrounds are given substantially different sentences." *People v. Ramos*, 353 Ill. App. 3d 133, 139 (2004); *People v. Smith*, 214 Ill. App. 3d 327, 342 (1991). To prevail on a claim of disparate sentencing, a defendant bears the burden of demonstrating that he and his codefendant were both (1) equally culpable and (2) "similarly situated with respect to background, prior criminal history, and potential for rehabilitation." *Ramos*, 353 Ill. App. 3d at 139; *People v. Curry*, 296 Ill. App. 3d 559, 569 (1998). In the case at bar, defendant's claim falters on the first prong. For the reasons explained below, we cannot find that the trial court abused its discretion in making a factual finding that defendant was more culpable than the other codefendants.

¶ 54    Defendant argues that he was less culpable than codefendant Ramirez, who received a shorter sentence. Defendant was the first person to hit the victim and, by knocking the victim to the ground, defendant enabled the attack to proceed. However, defendant argues that it was Ramirez who stabbed the victim when the victim was down and that the assistant medical examiner testified that the victim died from these stab wounds. Thus, defendant argues that he was not the person who administered the fatal stroke.

¶ 55    Although all the trials of the defendants involved in this offense were severed, the same trial judge presided over the trials and sentencings of all four defendants charged in the offense. After considering factors in aggravation and mitigation, he sentenced them as follows: (1) defendant, 45 years; (2) Pablo Colon, 40 years (*People v. Colon*, 2018 IL App (1st) 160120, ¶ 1); (3) Marco Ramirez, 35 years (*People v. Ramirez*, 2018 IL App (1st) 161554-U, ¶ 2); and (4) Gary Sams, 30 years (*People v. Sams*, 2017 IL App (1st) 160869-U,

¶ 2).[7] See *People v. James*, 2017 IL App (1st) 143391, ¶ 162 (in a disparate sentencing claim, a reviewing court may take judicial notice of codefendants' appeals and sentences); see *People v. Jimerson*, 404 Ill. App. 3d 621, 634 (2010) (a reviewing court may take judicial notice of codefendant's related appeal).

¶ 56 Similar to defendant, codefendant Colon argued on appeal that his 40-year sentence was disproportionate to a lesser sentence received by another codefendant. *Colon*, 2018 IL App (1st) 160120, ¶¶ 63-64 (arguing that his sentence was disproportionate to the 30-year sentence received by codefendant Sams). In *Sams*, we did not find Colon's claim persuasive, where the trial court specifically found that Colon's involvement in the offense was greater than Sam's involvement, since Colon was one of the people " 'leading the charge' " and, thus, " 'deserved a more severe sentence.' " *Colon*, 2018 IL App (1st) 160120, ¶ 69.

¶ 57 Similarly, in the case at bar, the trial court found "that the defendant was the leader of the pac[k], so to speak, and that he was armed with the bat that struck the first blow that knocked the victim down and allowed the other individuals to continue the attack." The trial court explained that "defendant's primary rol[e]" in the attack "require[d] [in] the Court's discretion a sentence greater than the minimum, and greater commensurate with the other individuals based on their level of participation."

¶ 58 Thus, the trial court specifically considered the issue that defendant raises now— namely, relative culpability—and made a specific factual finding regarding it. First, although the trial court did not expressly refer to codefendant Ramirez by name in its statement, we observe that the court's finding that defendant was the first person to strike the victim

---

[7]In his brief to this court, defendant argues that "it is possible that the disparity was simply unknown to the trial judge." We do not find this argument availing, in light of the fact that it was the same trial judge who presided over every sentencing.

necessarily includes the finding that Ramirez was not the first to attack. Second, the court stated that it had considered "the other individuals" and "their level of participation" and that it had found, in its discretion, that defendant's sentence should be "greater" due to defendant's primary role in the offense. Lastly, the trial court's carefully graduated sentencing, with each sentence five years apart from the next sentence, indicates that the trial court considered each defendant's role in the offense. As we did in *Colon*, we cannot find that the trial court abused its discretion in making its findings about this issue and, thus, affirm. See *Colon*, 2018 IL App (1st) 160120, ¶ 70.

¶ 59        Consideration of the second prong—namely, the respective backgrounds of defendant and codefendant Ramirez—does not lead us to a different conclusion. Defendant argues that, like Ramirez, he had no felony convictions prior to the instant offense. However, the lack of felony convictions prior to the instant offense is only one piece of defendant's criminal history. Defendant's presentence report shows that, prior to the instant offense, he pled guilty on November 30, 2005, to "Aggravated Assault-Gun, Knife" and was sentenced to one year of court supervision. In addition, after the offense in question, defendant plead guilty in 2017 to gunrunning and was sentenced to seven years and seven months with IDOC. See 720 ILCS 5/24-3A(a) (West 2012) ("A person commits gunrunning when he or she transfers 3 or more firearms" in violation of section 24-3 of the Criminal Code of 2012 (720 ILCS 5/24-3 (West 2012).). At the sentencing hearing in the case at bar, the State established that the underlying acts of defendant's felony gunrunning conviction occurred in April 2012, two years after the murder here. The two-year time lapse between the instant offense and the subsequent gunrunning offense showed that defendant remained unrepentant long after the instant offense occurred. Based on the subsequent offense, the trial court expressly found: "I have

23

considered aggravating that the defendant continued in his gang activity with the other case of gun running that occurred after this incident." Thus, defendant has also failed to show that the respective backgrounds of the two defendants were similarly situated.

¶ 60                                                         CONCLUSION

¶ 61        For the foregoing reasons, we do not find defendant's claims on appeal persuasive and affirm his conviction and sentence.

¶ 62        Affirmed.

¶ 63        JUSTICE LAMPKIN, specially concurring:

¶ 64        I respectfully concur only in the judgment reached.

**No. 1-17-2156**

| | |
|---|---|
| **Cite as:** | *People v. Guerrero*, 2020 IL App (1st) 172156 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-18726(02); the Hon. Matthew E. Coghlan, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Andrew Smith, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |