2024 IL App (1st) 230312-U

No. 1-23-0312

Order filed April 10, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 9679 |
| | ) | |
| MARTEZ STAPLES, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices D.B. Walker and R. Van Tine concurred in the judgment.

**ORDER**

¶ 1     *Held*: Circuit court's judgment affirmed where defendant failed to preserve the issues for review and no clear or obvious error occurred, as the State's remarks in rebuttal closing argument were invited by defense counsel and did not substantially prejudice defendant.

¶ 2     Following a jury trial, defendant Martez Staples was found guilty of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2012)) and sentenced to 35 years in prison. On appeal, defendant contends that the prosecution made improper remarks during rebuttal closing

argument, and defense counsel was ineffective for failing to preserve the issues for appellate review. We affirm.[1]

¶ 3    On August 17, 2013, defendant was indicted for multiple offenses arising from a shooting in Chicago involving three victims, Willie Bush, Carlos Lane, and Diontae Hurst. Bush died as a result of his injuries. The State proceeded on two counts of first-degree murder as to Bush, one count of aggravated battery with a firearm as to Lane, and one count of aggravated battery with a firearm as to Hurst.

¶ 4    At trial, Lane testified that at approximately 9 p.m. on August 17, 2013, he was at Bush's residence on South Lawndale Avenue sitting on the porch with Bush, Diontae Hurst, Brandon Hurst, Chaquina Hunter, and James Jones.[2] Lane observed three vehicles park and three or four individuals exit each vehicle. The group approached the porch, and Lane noticed an older man leading the group with blood on his clothes. The older man stated that "some guys beat [him] up" and inquired if Bush knew who did it. Bush stated that he did not know. Defendant, who was part of the group and identified by Lane in court, interjected, asking, "[w]hich one of you n*** ever hang out with them before?" Defendant stood approximately two feet from Lane, and Lane had never seen him before. Defendant asked again and then he and another individual drew firearms and began shooting.

¶ 5    Lane was shot in the face and shoulder and saw smoke coming from defendant's firearm. Lane attempted to "flip back off" the porch but a spike from a gate entered his leg and "ripped"

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] Since Brandon Hurst and Diontae Hurst share the same last name, we will refer to them by their first names.

through his thigh. After he fell to the ground, he continued to hear gunshots. He was "hit in the bicep, two times in [his] back, through the back of [his] hand and on top of [his] head." The gunshots stopped, and Lane opened his right eye and heard gunshots again. There was a light on the porch and a streetlight in front of the residence.

¶ 6      In October 2013, Lane spoke with Diontae and learned defendant's name. Lane called a friend and asked the friend to search defendant's name. His friend sent him a picture, and Lane recognized the individual as defendant. Lane immediately called a Chicago police detective. When the detective returned his call, he gave the detective defendant's name and stated that he saw a photograph of defendant. Lane did not hear anything from the police department between October 2013 and April 2014.

¶ 7      Lane called the police department in April 2014, and Detective Matthew Benigno returned his call. Lane informed Benigno of defendant's name and the photograph. On August 27, 2014, Lane met with Benigno and identified defendant in a photograph, which was identical to the photograph that Lane's friend sent him. On December 9, 2014, Lane identified defendant in a photo array, which contained a different photograph than the one Lane previously identified. Lane also identified a third photograph of defendant, where defendant had a different hairstyle.

¶ 8      On cross-examination, Lane testified that the shooting occurred after dark, and the streetlights had come on. After Lane was shot in the face, Lane observed defendant "holding a gun in front of [Lane's] face." Lane did not observe who fired the gunshots while he laid face down on the ground.

¶ 9      Diontae testified that when the vehicles arrived, 20 to 30 people approached the porch. Diontae noticed Freddie Kane in the group and observed blood on him. Hunter left the porch, and

one of the individuals with Kane walked onto the porch. Diontae saw someone "up a gun and point" at Lane. Diontae looked behind him and saw someone else "up a gun and point directly at [him]." Diontae attempted to run and then heard gunshots. He was hit in his back and shoulder and ran into the house, where he saw Bush enter and collapse. While in the hospital, Diontae told detectives that he did not know the shooters but knew Kane. On August 20, 2013, Diontae identified Kane from a photo array. On November 29, 2014, Diontae identified defendant as one of the shooters from a photo array.

¶ 10    On cross-examination, Diontae testified that he did not see the face of the individual standing in front of Lane. Diontae was turned away from the shooters when he was shot. Diontae saw a photograph of defendant within a week after Diontae was released from the hospital. Diontae's friend showed him a photograph of defendant, and "people in the streets" said that defendant's sister was "telling on him." Diontae identified defendant in a photo array as the individual who aimed a firearm at Lane. Diontae did not see anyone shoot anyone.

¶ 11    Brandon testified that three vehicles arrived and 12 to 15 men exited and approached the porch. Jones and Hunter left the porch before the men approached. Kane "walked up" and was "beat up and bloodied." Brandon did not recognize anyone else in the group. Kane came on the porch and conversed with Bush. Two or three of the men with Kane stepped onto the porch. Someone yelled, "f*** it, we here already" and began shooting. Brandon "dropped and ducked" and heard 30 to 50 gunshots. On December 9, 2014, Brandon viewed a photo array and could not identify anyone.

¶ 12    Hunter testified that she observed three individuals with firearms and left the porch. Someone on the porch said, "[f]*** that, they did it." When she reached the other side of the street,

"the guns went off." She heard approximately three different firearms discharge. She ran to Bush's sister's residence, looked out the window, and observed someone shoot Lane while he was on the ground. Hunter later went to the hospital and learned that Bush passed away. On December 28, 2014, she viewed a photo array and was unable to identify anyone. She did not observe Diontae, Bush, Lane, or Brandon with firearms.

¶ 13    Benigno testified that on August 19, 2013, Bush's sister provided an address for Kane. During Benigno's investigation of the address, he learned that an individual named Fred Staples resided there.[3] Benigno generated a photo array containing Fred, and Diontae identified Fred in the photo array as the person he knew as Freddie Kane. On April 14, 2014, Benigno received a call from Lane, who provided defendant's name. On August 27, 2014, Lane identified a photograph of defendant, and on December 9, 2014, Lane identified defendant in a photo array as the person who shot him. On cross-examination, Benigno stated that Lane gave him defendant's name during a phone call.

¶ 14    Chicago police detective Vidas Nemickas testified that on November 29, 2014, Diontae identified defendant in a photo array as the person who aimed a firearm at Lane.

¶ 15    Dr. Ponni Arunkumar, Cook County chief medical examiner, testified that she reviewed the postmortem examination, photographs, and toxicology report conducted by another pathologist relating to Bush. Dr. Arunkumar concluded that Bush's cause of death was multiple gunshot wounds and manner of death was homicide.

¶ 16    The parties entered multiple stipulations regarding Lane's and Diontae's injuries and surgeries.

_____

[3] Since Fred Staples shares the same last name as defendant, we will refer to him by his first name.

¶ 17    As part of the State's case-in-chief, the court entered into evidence defendant's birth certificate, which listed his mother as Willie Staples. Willie Mae Staples' birth certificate was entered into evidence, with her parents listed as Fannie Keys and Doc Staples. Freddie King Staples' birth certificate was also entered into evidence, with the same parents listed as defendant's mother.

¶ 18    The defense presented one witness, Dr. Geoffrey Loftus, who testified as an expert in the field of perception and memory. Dr. Loftus explained that he had been qualified as an expert in approximately 485 cases, but had been called by the prosecution to testify in one case. Dr. Loftus did not interview any of the witnesses in the present case.

¶ 19    Dr. Loftus explained that there are two pathways for information to become a memory: the conscious experience route and the post-event information route. Through the conscious experience route, an individual creates a memory based on sensory data while experiencing the event. Through the post-event information route, an individual uses post-event information to "fill the holes in their original memory of the event and essentially construct a better story of what the original event is all about." He testified that whether post-event information is correct or incorrect cannot be determined. Memories can be impacted by low lighting, a witness' degree of attention, weapon focus, the amount of time someone perceives an event, and stress. An individual may express high confidence in a fact that may not be true.

¶ 20    On cross-examination, Dr. Loftus testified that he did not go to the scene or Bush's residence. He agreed that he was not testifying regarding whether any witness "saw what they claimed to have seen." He had no opinion regarding the veracity of the witnesses and the testimony. Dr. Loftus had no knowledge regarding what a witness actually focused on or how well the witness

observed the incident. He could not know for certain how an individual would react in a certain situation, but could make "some pretty good predictions." He did not know if a witness' memory was "good or bad" or know their stress or attention level during the event. Dr. Loftus further did not know what someone's conscious memory was or if there were outside influences.

¶ 21    Prior to closing arguments, the trial court admonished the jury that what an attorney states is not evidence and should not be considered as such. The trial court also instructed the jury to disregard statements not based on the evidence or a reasonable inference therefrom.

¶ 22    During closing arguments, the State argued that defendant was guilty of first-degree murder of Bush and aggravated battery with a firearm of Lane and Diontae.

¶ 23    In response, defense counsel argued that Lane believed that defendant "did it," but Dr. Loftus explained why Lane's belief was so "steadfast and true and deep in him." According to defense counsel, Lane believed it because Diontae told him defendant's name. Counsel stated that Lane's memory was affected by the post-event information of Diontae giving Lane defendant's name and argued that Lane's identifications were "tainted by the weakness and the circumstances surrounding the first identification." Counsel further stated that Dr. Loftus explained that Lane and Diontae would not have been able to "reliably identify the faces." Counsel argued that Lane had done as Dr. Loftus suggested and filled the gaps in his memory with post-event information. In contrast, according to counsel, the State presented "a lot of evidence that had nothing to do with eyewitness identification, and that is window dressing."

¶ 24    In rebuttal, the State argued that Dr. Loftus was in the "science of speculation" and gave opinions tailored to one side. Defense counsel objected, and the court overruled the objection. The State further argued that Dr. Loftus "wasted" the jury's time with "window dressing." Dr. Loftus

told the jury that "some memories [were] good and some [were] not. Some [were] influenced by outside information and some [were] exactly what happened." The State contended that Dr. Loftus "basically" told them he did not know what any witness who testified actually experienced during the incident or what impacted their memories. Dr. Loftus could not tell the jury a witness' observations and experience during an event because "science has not evolved to the point where we can get inside someone's brain and see what they actually observed and what they actually felt." The State contended that "quack science" was presented, and "Dr. Loftus wanted you to think that if you're more certain, you must be making it up, it must be from outside influences," which was contrary to what the Illinois Supreme Court "believes the law should be." The State also argued that its burden was "beyond a reasonable doubt. Reasonable, not all. Not all doubt."

¶ 25    Prior to deliberations, the court instructed the jury that in order to find defendant guilty, it must find that the State proved defendant guilty of every element of each charged crime beyond a reasonable doubt. The jury found defendant guilty of aggravated battery with a firearm of Lane and not guilty of first-degree murder of Bush and aggravated battery with a firearm to Diontae.

¶ 26    Defendant filed a motion for a new trial, which the trial court denied. In his posttrial motion defendant did not argue that the State denigrated the expert witness. The court imposed a 35-year prison sentence. Defendant filed a motion to reconsider sentence, which the trial court denied.

¶ 27    On appeal, defendant argues that during rebuttal closing argument, the State denigrated his expert witness, Dr. Loftus, offered non-expert opinions regarding the scientific validity of Dr. Loftus' testimony, and misstated the law regarding reasonable doubt. Defendant further contends that defense counsel was ineffective for failing to preserve the issues for appellate review.

¶ 28    The issue of the State's alleged improper remarks during rebuttal was not properly preserved for review. To preserve an issue for appellate review, a defendant must (1) object at trial and (2) raise the error in a posttrial motion; otherwise, it is considered forfeited. *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 14. Defendant concedes that he failed to object to all of the State's challenged remarks and raise them in his posttrial motion. However, he requests review under the plain-error doctrine.

¶ 29    Under the plain-error doctrine, a reviewing court may consider forfeited errors when a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20. Defendant argues both prongs. However, to prevail under either prong, defendant bears the burden of proving actual error. *People v. Mudd*, 2022 IL 126830, ¶ 22. Without a clear or obvious error, there can be no plain error. *People v. Khan*, 2021 IL App (1st) 190679, ¶ 105. Accordingly, we must first determine whether a clear or obvious error occurred. *People v. Logan*, 2024 IL 129054, ¶ 53.

¶ 30    While the State has wide latitude during closing arguments, it is improper for the State to make comments that have no purpose other than to arouse the prejudices and passions of the jury. *People v. Cross*, 2019 IL App (1st) 162108, ¶ 73. However, even when remarks are inappropriate, reversal is only required when the remarks created such substantial prejudice against the defendant that it is impossible to tell whether the verdict of guilt resulted from them. *Cross*, 2019 IL App (1st) 162108, ¶ 74 (citing *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007)). If the reviewing court

cannot ascertain whether the prosecutor's improper remarks contributed to the defendant's conviction, or the jury could have reached a different verdict had the improper remarks not been made, then this court must grant a new trial. *People v. Stewart*, 2023 IL App (1st) 210912, ¶ 75.

¶ 31 Defendant asserts that the standard of review for prosecutorial misconduct regarding the State's remarks during rebuttal is abuse of discretion, citing *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 54 (*overruled on other grounds by People v. Taylor*, 2023 IL 128316). This court acknowledges that the Illinois Supreme Court has applied both a *de novo* standard (*Wheeler*, 226 Ill. 2d at 121) and an abuse of discretion standard (*People v. Blue*, 189 Ill. 2d 99, 128 (2000)) when reviewing a prosecutor's remarks during closing argument. This court has reasoned that the abuse of discretion standard used in *Blue* pertains to the trial court's determinations regarding the State's conduct, while in contrast, the *de novo* standard used in *Wheeler* concerns whether the State's remarks were so egregious to warrant a new trial, which is a legal issue. Regardless, we find that the State's comments were proper under either standard. See *Stewart*, 2023 IL App (1st) 210912, ¶ 77.

¶ 32 Defendant first argues that the State made improper remarks when it denigrated Dr. Loftus, by stating that he was in the "science of speculation" and gave opinions tailored to one side. Defendant contends that the State also improperly stated that Dr. Loftus "wasted" the jury's time with "window dressing" and mischaracterized the evidence when it stated, "Dr. Loftus wanted you to think that if you're more certain, you must be making it up, it must be from outside influences." Defendant further contends that it was also improper for the State to remark that Dr. Loftus' testimony was contrary to what the Illinois Supreme Court "believes the law should be," and the State offered its own non-expert opinion regarding the science Dr. Loftus discussed by stating that

"science has not evolved to the point where we can get inside someone's brain and see what they actually observed and what they actually felt."

¶ 33    The State initially made no remarks regarding Dr. Loftus during its closing argument. However, defense counsel argued that Dr. Loftus explained why Lane was so "steadfast" in his belief regarding his identification of defendant and had filled the gaps of his memory with post-event information, like Diontae providing him defendant's name. Defense counsel further argued that Dr. Loftus demonstrated that Lane and Diontae would not have been able to "reliably identify the faces." The State then addressed Dr. Loftus's testimony in its rebuttal. Thus, the State's remarks during rebuttal were invited by defense counsel's closing argument. *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 108 (statements that are provoked or invited by defense counsel's argument will not be held improper).

¶ 34    Further, the State's challenged remarks were, for the most part, reasonable inferences from Dr. Loftus's testimony. Dr. Loftus testified that although he has been qualified as an expert in over 400 cases, he had only testified on behalf of the prosecution on one occasion. Dr. Loftus testified that he did not know what any witness actually experienced during the incident and confirmed that he could not determine, while a witness testified, which memories were accurate and which were false. Further, Dr. Loftus did not provide an opinion regarding whether any witness' recollections were false or impacted by outside factors. Dr. Loftus stated that he could not know with certainty how an individual would react in a certain situation, but could make "some pretty good predictions." The State's remarks that Dr. Loftus gave testimony tailored to one side, did not know what any witness who testified actually experienced during the incident or what impacted their memories, and could not determine which memories were accurate are reasonable inferences from

this testimony. Accordingly, we do not find the State's remarks improper when they were invited by defense counsel (*Anderson*, 2017 IL App (1st) 122640, ¶ 108) and argued reasonable inferences from the testimony (*People v. Temple*, 2014 IL App (1st) 111653, ¶ 77) ("the State has wide latitude to comment on and draw reasonable inferences from the evidence during closing argument").

¶ 35    Some of the State's remarks may have been inappropriate, such as referring to Dr. Loftus' testimony as "quack science." However, "[t]he wide latitude extended to prosecutors during their closing remarks has been held to include some degree of both sarcasm and invective to express their points." *People v. Banks*, 237 Ill. 2d 154, 183 (2010). Further, the State's remarks did not rise to the level of such substantial prejudice that they contributed to defendant's conviction. *Stewart*, 2023 IL App (1st) 210912, ¶ 75. Our review of the State's rebuttal closing argument in its entirety and in context does not establish that defendant's verdict would have been different had the State not made the challenged remarks. See *Cross*, 2019 IL App (1st) 162108, ¶ 105 (quoting *Wheeler*, 226 Ill. 2d at 122) ("[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context."); see also *Stewart*, 2023 IL App (1st) 210912, ¶ 75 (this court considers whether the jury could have reached a different verdict had the remarks not been made).

¶ 36    Here, Lane identified defendant as the individual who shot him, and Diontae identified defendant as the individual who drew a firearm and aimed it at Lane. Defendant presented no evidence to contradict the identifications. While Dr. Loftus discussed what may impact a memory, Dr. Loftus also testified that he did not know what, if anything, impacted any of the witnesses' memories and could not determine whether their memories were accurate. During rebuttal, the State did not misstate the facts of the case that the jury heard during trial, and therefore, we do not

believe that defendant's verdict would have been different without the State's challenged remarks regarding Dr. Loftus. Thus, defendant has not shown that he was substantially prejudiced by those remarks.

¶ 37    Since we do not find that the State's remarks were improper or that defendant was substantially prejudiced by the challenged remarks, we find no clear or obvious error occurred allowing us to review the merits under the plain-error doctrine. *Temple*, 2014 IL App (1st) 111653, ¶ 82.

¶ 38    Defendant next argues that the State misstated the law when arguing that it met its burden to prove his guilt beyond a reasonable doubt.

¶ 39    The State, as noted, argued that its burden of proof was "beyond a reasonable doubt. Reasonable, not all. Not all doubt." The State properly emphasized that it bore the burden of proving defendant guilty beyond a reasonable doubt. *People v. Murray*, 2019 IL 123289, ¶ 28 (the United States and Illinois constitutions protect a defendant from conviction except upon proof beyond a reasonable doubt). Illinois law is clear that "neither the court nor counsel should attempt to define the reasonable doubt standard for the jury." *People v. Speight*, 153 Ill. 2d 365, 374 (1992).

¶ 40    We do not find the State's argument that reasonable doubt did not mean all doubt attempted to define the reasonable doubt standard; rather, counsel merely discussed the level of doubt the jury must have. *People v. McGee*, 2015 IL App (1st) 130367, ¶ 60 (finding no error where counsel's discussion of reasonable doubt during closing argument focused on the fact that the word doubt is modified by reasonable). Additionally, the trial court reiterated to the jury that the State had the burden to prove defendant guilty beyond a reasonable doubt. Accordingly, we do not find that without the State's remark the jury would have reached a different verdict. *Stewart*, 2023 IL

App (1st) 210912, ¶ 75. As no error occurred, defendant's request for plain-error review lacks merit.

¶ 41    Lastly, defendant argues that defense counsel was ineffective for failing to preserve the issues for appeal. To succeed on a claim of ineffective assistance, defendant must establish that counsel's performance was deficient and "resulted in prejudice." *People v. Lewis*, 2022 IL 126705, ¶ 44. Failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Simpson*, 2015 IL 116512, ¶ 35. As discussed above, we did not find a clear or obvious error; therefore, we cannot find counsel ineffective. *People v. Carr-McKnight,* 2020 IL App (1st) 163245, ¶ 93 (holding that "because there was no clear or obvious error, there cannot be ineffective assistance of counsel"). Accordingly, defendant has not established that counsel was ineffective for failing to preserve the issues for appellate review.

¶ 42    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 43    Affirmed.