# Illinois Official Reports

## Appellate Court

---

### *People v. Seal*, 2015 IL App (4th) 130775

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL SEAL, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-13-0775 |
| Filed | August 24, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 09-CF-998; the Hon. Leo J. Zappa, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Rachel Moran, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>John Milhiser, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE POPE delivered the judgment of the court, with opinion.<br>Justice Knecht concurred in the judgment and opinion.<br>Justice Steigmann specially concurred, with opinion. |

**OPINION**

¶ 1    In an August 2012 bench trial, the trial court found defendant, Michael Seal, guilty of first degree murder. In July 2013, the court sentenced defendant to 40 years in prison.

¶ 2    On appeal, defendant argues he is entitled to a new trial because the trial court failed to correctly admonish him as to the waiver of counsel. We reverse and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4    In November 2009, by complaint, the State charged defendant with three counts of first degree murder for allegedly stabbing and killing his mother, Darla Key (720 ILCS 5/9-1(a)(1), (2) (West 2008)). At defendant's first appearance in November 2009, defendant was furnished with a copy of the complaint and advised of the nature of the charges and possible penalties. At that time, the public defender's office was appointed to represent defendant.

¶ 5    On December 3, 2009, the State filed a three-count information charging defendant with first degree murder. Defendant's appointed counsel, Brian Otwell, waived formal reading of the charges and potential penalties. Defendant waived his right to a preliminary hearing.

¶ 6    At a September 2010 hearing, the trial court advised defendant new counsel would have to be appointed to represent him due to Otwell becoming a judge. Thereafter, Bob Scherschligt became defendant's appointed counsel.

¶ 7    In February and March 2011, among other *pro se* filings, defendant filed a series of letters, affidavits, and motions regarding his representation by Scherschligt. These included an "Affidavit of Requested Legal Services," a "Motion to Compel Legal Services," an "Affidavit Requesting to Issue Warrant for Immediate Arrest," and a "Motion of Ineffective Assistance of Counsel."

¶ 8    At a March 2011 hearing, the trial court advised defendant he had the right to be represented by counsel or represent himself, but not both. The court considered defendant's ineffective assistance claims. Defendant stated he could not get along with Scherschligt. He knew he was facing 60 years in prison. Therefore, he stated he would prefer to represent himself. Scherschligt advised the court he was doing all he could to meet the demands of defendant regarding discovery; however, defendant wanted Scherschligt to file motions he deemed frivolous and Scherschligt refused to file them. Scherschligt also indicated defendant refused to assist him and mentioned defendant had the same problems with Otwell. Scherschligt was willing to continue representing defendant along with cocounsel, Lindsay Evans. The court acknowledged defendant had issues with Otwell's representation and admonished defendant about the qualifications of the public defenders and the fact they would not file frivolous motions, nor would the court entertain frivolous motions. After further discussion, the court appointed James Elmore to represent defendant with assistance from Evans.

¶ 9    In June and August 2011, defendant again filed several *pro se* motions. At an August 2011 hearing, Elmore advised the trial court he had done everything to gain defendant's trust but defendant wanted to make decisions that were Elmore's to make as defendant's counsel. Elmore sought confirmation about his continued representation of defendant. The court again

admonished defendant about his right to be represented or to represent himself, but not both, and advised defendant Elmore was the most experienced public defender in Sangamon County. The court struck defendant's *pro se* motions. After further discussion, the court asked Elmore to get his investigator involved and Elmore's representation was continued.

¶ 10	In January 2012, defendant filed a *pro se* "Request for Remedies," alleging, *inter alia*, issues with Elmore's representation. In February 2012, defendant filed a *pro se* "Request for Legal Services," stating "Elmore must abide by the client[']s [(defendant)] decision as to how the representation is handled" and defendant "[would] not negotiate his defense with *** Elmore." Defendant sought sanctions against Elmore along with a list of 19 demands for Elmore to perform. In March 2012, defendant filed a *pro se* "Motion of Ineffective Assistance of Counsel," containing numerous complaints about Elmore's representation. At a March 2012 hearing on the motion, Elmore advised the trial court he had met with defendant on numerous occasions, defendant had told Elmore he wanted to represent himself, and Elmore asked to be discharged from the case. The court noted Elmore was defendant's third or fourth attorney and the court was not going to appoint another; therefore, defendant must choose to continue with Elmore or represent himself. Defendant inquired about appointment of advisory counsel and the court responded Elmore could be stand-by counsel. After a lengthy discussion about defendant's allegations and Elmore's response thereto, defendant agreed to have Elmore continue as his attorney.

¶ 11	In April 2012, defendant filed a "Motion to Proceed *Pro Se*," alleging he and Elmore could not see eye-to-eye. He sought immediate termination of Elmore and his investigator. He alleged he was forced to represent himself since the court had refused to appoint new counsel, cocounsel, or advisory counsel. In May 2012, the trial court heard defendant's motion to proceed *pro se*. Defendant indicated he and Elmore could not get along. He asked for appointment of another attorney. The court noted this was defendant's third appointment and Elmore was one of the best attorneys around for his case. The court relieved Elmore of his duties. Thereafter, referring to *People v. Williams*, 277 Ill. App. 3d 1053, 1056-57, 661 N.E.2d 1186, 1189 (1996), the court admonished defendant as follows:

> "I am going to read you the *pro se* issues *** regarding representing yourself and they are as follows:
>
> Presenting the defense is not a simple matter of telling one's story but requires adherence to various technical rules governing the conduct of a trial.
>
> A lawyer has substantial experience and training in legal procedure, and the [p]rosecution will be represented by experienced attorneys.
>
> A person unfamiliar with legal procedures as yourself (a) may allow the [p]rosecutor an advantage by failing to make objections to inadmissible evidence, (b) may not make effective usage of such rights as the *voir dire* of [j]urors, and (c) may make tactical decisions that produce unintended consequences.
>
> The [d]efendant proceeding *pro se* will not be allowed to complain on appeal about the competency of his representation.
>
> The effectiveness of his defense may well be diminished by his dual role as attorney and accused.
>
> Defendant will receive no special consideration from the [c]ourt.
>
> Defendant will receive no extra time for preparation or greater library time.

A lawyer can render important assistance (a) by determining the existence of possible defenses to the charge against the [d]efendant, (b) through consultations with the [p]rosecutor regarding possible reduced charges or lesser penalties, and (c) in the event of a conviction, by presenting to the [c]ourt matters which might lead to a lesser sentence.

In the event that the [c]ourt accepts the [d]efendant's decision to represent himself, this [d]efendant will not be given an opportunity to change his mind during trial.

\* \* \*

[Defendant], so, if you do not want Mr. Elmore, that is what you are looking at by law. Those are the things that you must consider for representing yourself. I didn't make them up. I didn't write them. That's in the case law. Do you understand?"

Defendant indicated his understanding. Defendant also indicated his desire to have the investigator terminated, knowing the court would not hire anyone else.

¶ 12 At a June 2012 pretrial hearing, the trial court noted it had written to defendant in response to a letter defendant sent to the court. Defendant advised he had received the court's letter. In its letter, the court asked defendant to consider allowing the court to appoint two new attorneys (one who had done numerous murder cases) to represent him. Defendant declined the offer.

¶ 13 In July 2012, defendant waived his right to a trial by jury. The trial court did not admonish defendant of the nature of the charges nor the penalties therefor.

¶ 14 At the August 2012 bench trial, the State introduced a 9-1-1 call made on November 16, 2009, in which defendant identified himself by name and informed the dispatcher he had killed his mother, Darla Key, by putting "a knife through her chest."

¶ 15 Springfield police officer Mark Marinelli testified he was one of the officers who responded to the 9-1-1 call and helped take defendant into custody. Marinelli transported defendant to the police department. En route to the police department, defendant asked Marinelli "if there was a death penalty in the State of Illinois." After Marinelli put defendant in an interview room at the police station, he asked Marinelli to shut the door "because I killed my mom."

¶ 16 Defendant's former girlfriend, Terri Merrel; his sister, Stephanie Martin; and Key's former coworker, Debra Zehr, all testified they had heard defendant get upset and threaten to kill his mother at various times in the months prior to Key's death. Defendant's brother, stepmother, aunt, and uncle all testified defendant called them on the night of Key's death. Defendant's brother, John Seal, testified defendant sounded "real weird" and was talking about killing himself. Seal asked defendant what he had done, but defendant would not say. Defendant asked to speak to his stepfather, who lived in the same house as John Seal. Defendant's stepfather, Leslie Schuck, and his stepmother, Julie Seal, testified defendant told them he had killed his mother by stabbing her in the chest. Defendant's aunt, Suzan Englemann, testified defendant called her and said he had "done the unthinkable" but would not say what. Defendant's uncle, Michael Engelmann, also testified defendant admitted killing his mother.

¶ 17    The various law enforcement officers and medical personnel who responded to the 9-1-1 call found Key lying on the floor in her trailer home. She had a stab wound to the chest and was dead.

¶ 18    Forensic pathologist Dr. John Denton testified he reviewed Key's autopsy, including the autopsy report of Dr. Jessica Bowman and several other items. Denton stated the cause of Key's death was a stab wound to the chest.

¶ 19    The State and defendant stipulated neither defendant's blood nor fingerprints were found on the knife determined to be the murder weapon. Further defendant's deoxyribonucleic acid was not found under Key's fingernails.

¶ 20    Defendant did not testify.

¶ 21    The trial court found defendant guilty of first degree murder.

¶ 22    In October 2012, the trial court appointed counsel to assist defendant with posttrial motions and at sentencing. In July 2013, the court denied defendant's amended motion for new trial and sentenced him to 40 years in the Department of Corrections (DOC) with 1,349 days of sentence credit. In September 2013, the court denied defendant's motion to reconsider his sentence.

¶ 23    This appeal followed.

¶ 24                                    II. ANALYSIS

¶ 25    On appeal, defendant argues his pretrial waiver of counsel was invalid because the trial court did not provide him with the admonitions required by Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) before accepting his waiver of counsel. The State admits the court did not admonish defendant pursuant to Rule 401(a) but argues he waived his right to counsel "by conduct" and the court substantially complied with the requirements of Rule 401(a) where the record shows the wavier was made knowingly and voluntarily and the admonishments given did not prejudice defendant's rights. We reverse and remand for a new trial.

¶ 26    Initially, we note defendant failed to object to the lack of Rule 401(a) admonishments at trial or in a posttrial motion, and therefore the issue was forfeited and cannot be considered on appeal unless it was plain error. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain-error doctrine bypasses forfeiture principles and allows a reviewing court to consider unpreserved error when: (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467, 479 (2005). This court has consistently held the right to counsel is so fundamental that we will review as plain error a claim there was no effective waiver of counsel although the issue was not raised in the trial court. See *People v. Robertson*, 181 Ill. App. 3d 760, 763, 537 N.E.2d 1036, 1039 (1989); *People v. Langley*, 226 Ill. App. 3d 742, 749, 589 N.E.2d 824, 829 (1992); *People v. Stoops*, 313 Ill. App. 3d 269, 273, 728 N.E.2d 1241, 1244 (2000). We therefore address defendant's claim on appeal.

¶ 27    The United States and Illinois Constitutions guarantee a criminal defendant the right to counsel at every critical stage of the proceedings against him. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A defendant may waive this right and proceed without counsel only if he voluntarily and intelligently elects to do so. *People v. Campbell*, 224 Ill. 2d 80, 84, 862 N.E.2d 933, 936 (2006).

¶ 28 Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) states as follows:

"Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court."

¶ 29 Our supreme court has held, "The language of Rule 401(a) could not be clearer: a trial court 'shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first *** informing him of and determining that he understands *** that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court.' [Citation.]" *Campbell*, 224 Ill. 2d at 84, 862 N.E.2d at 936. Further, "substantial compliance with Rule 401(a) is required for an effective waiver of counsel." *Id.* "Rule 401(a) admonishments must be provided at the time the court learns that a defendant chooses to waive counsel, so that the defendant can consider the ramifications of such a decision." *People v. Jiles*, 364 Ill. App. 3d 320, 329, 845 N.E.2d 944, 952 (2006). "There can be no effective waiver of counsel without proper admonitions." *Langley*, 226 Ill. App. 3d at 749, 589 N.E.2d at 829.

¶ 30 In the case *sub judice*, there was no compliance, substantial or otherwise, with Rule 401(a). Defendant made his first appearance in November 2009 where he was provided with a copy of the complaint and advised of the nature of the charges and possible penalties. At that time, the public defender's office was appointed to represent defendant. In December 2009, defense counsel appeared with defendant and waived formal reading of the charges and potential penalties.

¶ 31 Although defendant had repeatedly found fault with his various appointed counsel and had at times expressed the desire to represent himself, the trial court never admonished him pursuant to Rule 401(a) on those occasions. Nearly two and a half years after defendant was initially advised about the charges against him, the potential penalties he faced, and was appointed counsel, defendant actually moved to proceed *pro se* and Elmore was relieved of his duties as defense counsel. At that time, the court only advised defendant of the problems he would likely face as a *pro se* defendant as set forth in *Williams*, 277 Ill. App. 3d at 1056-57, 661 N.E.2d at 1189 (quoting *People v. Ward*, 208 Ill. App. 3d 1073, 1081-82, 567 N.E.2d 642, 647-48 (1991)). The court did not admonish defendant in accordance with Rule 401(a). It did not relate to defendant the nature of the charges, the minimum and maximum sentences defendant faced, nor did the court tell defendant he was entitled to counsel and counsel would be appointed to represent him if he was indigent. "The admonishments pursuant to Rule 401(a) must be provided when the court learns defendant chooses to waive counsel so that defendant can consider the ramifications of such a decision. Prior admonishments and defendant's decision to discharge counsel do not somehow cause defendant to forgo the right to be fully informed of the ramifications of acting on his own behalf." *Langley*, 226 Ill. App. 3d at 750, 589 N.E.2d at 830.

¶ 32 We reverse defendant's conviction and remand for a new trial, "before which defendant should be given the requisite admonishments and the opportunity to be represented by an attorney or to make a voluntary, knowing, and intelligent waiver of that right." *Jiles*, 364 Ill. App. 3d at 330, 845 N.E.2d at 953.

¶ 33 Also, because we are remanding for a new trial, we must consider whether another trial would violate the double-jeopardy clause. If the evidence presented at the first trial was sufficient for a rational trier of fact to find the essential elements of the crime had been proved beyond a reasonable doubt, no double jeopardy violation is created on retrial. See *People v. Ward*, 2011 IL 108690, ¶ 50, 952 N.E.2d 601. We find the record contains sufficient evidence from which the trial court could have found defendant guilty of first degree murder beyond a reasonable doubt. Therefore, no double jeopardy violation will occur upon retrial.

¶ 34                                III. CONCLUSION

¶ 35 For the reasons stated, we reverse the trial court's judgment and remand for a new trial.

¶ 36 Reversed and remanded.

¶ 37 JUSTICE STEIGMANN, specially concurring.

¶ 38 Defendant, convicted of first degree murder, gamed the system and got away with it. Although I agree with the majority opinion, I write this special concurrence to emphasize the mistakes the trial court made in this case. I do so in the hope that this discussion will keep other trial courts from committing the same errors.

¶ 39 The fundamental error the trial court committed was granting credence to defendant's unceasing complaints about his court-appointed lawyers and then changing those lawyers in a predictably vain effort to somehow assuage defendant.

¶ 40 The record shows that after the Sangamon County public defender Brian Otwell, defendant's initial counsel, was appointed to the bench, the trial court appointed Bob Scherschligt to be defendant's counsel. A few months later, defendant began his *pro se* filings, which attacked Scherschligt's representation. At the March 2011 hearing at which the court asked defendant about his ineffective assistance claims, defendant stated that he could not get along with Scherschligt. In response, Scherschligt advised the court that defendant wanted him to file motions he deemed frivolous and Scherschligt refused to file them. Scherschligt also indicated defendant refused to assist him and mentioned that defendant had the same problem with Otwell. Nonetheless, Scherschligt stated he was willing to continue to represent defendant along with cocounsel, Lindsay Evans.

¶ 41 The trial court acknowledged that defendant had problems with Otwell's representation and explained to defendant that public defenders would not file frivolous motions. Nonetheless, for reasons that are far from clear, the court appointed James Elmore to represent defendant with assistance from Evans.

¶ 42 Entirely predictably, Elmore's representation also failed to satisfy defendant. In June and August 2011, defendant continued to file *pro se* motions and continued to attack Elmore's effectiveness. At an August 2011 hearing, the trial court struck defendant's *pro se* motions, continued Elmore's representation, but asked Elmore to get his investigator involved.

¶ 43    Over the next several months, defendant continued to file *pro se* motions attacking Elmore's representation. At a March 2012 hearing, Elmore advised the court that defendant told Elmore he wanted to represent himself, and Elmore asked to be discharged from the case. The court noted that Elmore was defendant's third or fourth attorney, and the court was not going to appoint another. The court explained that the defendant must choose to continue with Elmore or represent himself. After a lengthy discussion, defendant agreed to have Elmore continue as his attorney.

¶ 44    Some months later, defendant filed a motion to proceed *pro se*, alleging that he could not get along with Elmore. He claimed he was forced to represent himself because the court had refused to appoint new counsel or advisory counsel.

¶ 45    In May 2012, the trial court conducted a hearing on defendant's motion and noted that Elmore was defendant's third attorney. Nonetheless, the court relieved Elmore of his duties and purported to admonish defendant in accordance with Rule 401(a).

¶ 46    Almost three years ago, in *People v. Ames*, 2012 IL App (4th) 110513, 978 N.E.2d 1119, this court addressed another case in which the defendant successfully gamed the system by expressing his repeated displeasure with his court-appointed counsel. In *Ames*, this court wrote the following regarding motions to withdraw:

"E. Dealing With Difficult Defendants Regarding Who Will Represent Them

We are not unsympathetic to the serious problem that this trial court and other trial courts encounter when dealing with difficult defendants regarding representation. The State's suggestion in this case that defendant might be 'playing the system' by his claimed difficulty both in getting along with appointed counsel and in failing to hire an attorney of his own choice may have been right, but trial courts must still handle such situations with extreme care for at least two reasons: (1) a defendant's right to counsel is a fundamental constitutional right and (2) if a court makes a mistake regarding this issue, it will constitute reversible error. ***

As a result of these concerns, we offer the following suggestions to trial courts dealing with difficult defendants regarding representation.

1. *Motions To Withdraw*

In most cases dealing with difficult defendants regarding representation, the difficulty manifests itself by a defendant's claimed inability to hire counsel. Although that situation occurred at a later point in this case, the circumstances here are somewhat unusual because the trial court initially appointed two different attorneys *** at two different times to represent defendant. Defendant was unhappy with both of his two court-appointed attorneys. They, in turn, found their dealings with him to be unpleasant and unproductive, causing them to file motions to withdraw. We note that the court's decision to force defendant to represent himself arose only after–and because–the court granted counsel's motions to withdraw.

We do not question the various assertions that both court-appointed counsel made in their motions to withdraw; we merely note that the circumstances those motions describe 'come with the territory.' That is, attorneys appointed to represent indigent defendants in criminal cases will rarely find their clients mistaken for Rotary Club

members or other leading citizens of the community. Instead, their clients are frequently angry, ignorant, suspicious, and personally abusive toward their court-appointed counsel. Such is the reality of the criminal justice system. But, so what? Cases involving such clients must still go forward, and court-appointed counsel should understand that (1) they can do no more than their best under difficult circumstances and (2) in most instances, there is no reason to believe–as shown in this very case–that any other court-appointed attorney will be able to do better.

Trial courts should not hesitate to reject motions to withdraw filed by court-appointed counsel when those motions are based on the ground that the relationship between the defendant and counsel has become 'poisonous' or unpleasant due to the defendant's bad behavior. Instead of granting such motions, the court should make clear to the defendant that (1) failing to cooperate with his counsel will hurt only the defendant and (2) the court will not replace counsel. Perhaps a graphic way of getting this point across is to explain that if the defendant is convicted and sentenced to prison, when the bus from the penitentiary comes to pick him up, only he will get on. His lawyer will go home.

Despite the difficulties court-appointed counsel may encounter representing an obstructionist defendant determined to interfere with an orderly and constructive attorney-client relationship, trial courts should almost never permit such counsel to withdraw from representing that defendant. A trial court's doing so only rewards and enables bad behavior. Courts delude themselves by thinking an obstructionist defendant is somehow going to behave better when a new court-appointed counsel enters the picture.

The issue in this case could have–and should have–been avoided. The trial court could have denied the attorneys' motions to withdraw. See Ill. S. Ct. R. 13(c)(3) (eff. Feb. 16, 2011) (a motion to withdraw 'may be denied by the court if the granting of it would delay the trial of the case, or would otherwise be inequitable'); *People v. Howard*, 376 Ill. App. 3d 322, 342, 876 N.E.2d 36, 51 (2007) (when dealing with a motion to withdraw under Rule 13(c)(3), a trial court has 'broad discretion')." *Id* ¶¶ 43-51.

¶ 47 The trial court's other key error in the handling of this difficult defendant was the court's indulging him with regard to his spurious *pro se* motions. Having once explained to defendant that there was no such thing as hybrid representation and that he could either have the services of court-appointed counsel or represent himself, the court (at a hearing with defendant present) should have routinely stricken all *pro se* motions filed by defendant that his counsel did not adopt and pursue. The court was under no obligation to consider any of these motions and erred by doing so.

¶ 48 As a last matter, I note that the trial court's obvious error of not complying with Rule 401(a) should have been equally obvious to the prosecutors handling this first degree murder case. Particularly when dealing with obstreperous defendants, trial courts might become distracted and inadvertently omit taking actions–like Rule 401(a) admonishments–that the law requires. When this happens, prosecutors should step forward and respectfully remind the court about any necessary steps that had been overlooked. The prosecutors' failure to do so in this case has resulted in a terrible waste of the limited resources of the criminal justice

system, given that this defendant has now had his conviction vacated, with the matter going back to the trial court for retrial.

¶ 49        All of this was entirely unnecessary.