2023 IL App (1st) 210912
Opinion filed May 4, 2023

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 11933 |
| | ) | |
| WYNTON STEWART, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Hoffman and Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1     Approximately one year after defendant Wynton Stewart was arrested and charged with the first degree murder of Jaquan Reed, defendant sought to waive his fundamental right to the assistance of counsel. At the time of his waiver, the Cook County circuit court did not provide him with the admonishments required by Illinois Supreme Court Rule 401(a) (eff. July 1, 1984)—admonishments meant to satisfy the constitutional requirement that a waiver of counsel must be voluntary, knowing, and intelligent. *People v. Haynes*, 174 Ill. 2d 204, 235 (1996).

¶ 2    Defendant mustered his own defense at trial and was subsequently found guilty of first degree murder. The trial court sentenced defendant to 30 years in the Illinois Department of Corrections for first degree murder, plus an additional 25 years because defendant personally discharged a firearm during the offense that proximately caused Reed's death.

¶ 3    The principal question of this appeal is whether defendant's waiver of counsel substantially complied with Rule 401(a). We hold that it did not. This record does not persuade us that defendant's decision was made with a full awareness of both his rights and the consequences of his decision to abandon those rights. Accordingly, we reverse and remand for a new trial.[1]

¶ 4    I. BACKGROUND

¶ 5    A. Procedural History

¶ 6    On July 25, 2018, two days after his arrest, the defendant appeared for a bond hearing, at which time the trial court informed defendant that he was charged with "the felony offense of first degree murder." It did not inform defendant that first degree murder is punishable by 20 to 60 years in prison, and there was no discussion of any firearm enhancement that would increase the possible penalties to a range of 45 years to natural life.

¶ 7    Defendant was arraigned on September 4, 2018. Appointed counsel entered a plea of not guilty to, as the trial court put it, "the six counts, which include first degree murder, many theories of it." Once again, there was no discussion on the record of any of the possible penalties or the exact nature of the charges.

_____

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 8    On June 25, 2019, defendant informed the trial court that he had fired his appointed public defender. The trial court told defendant that the public defender could not be fired and followed up by asking, "[D]o you want to represent yourself?" Defendant indicated his desire to proceed *pro se*. After the invocation of defendant's fundamental right to represent himself, the trial court questioned defendant at length about his schooling, work history, history of mental health issues, and previous involvement in the criminal justice system and the fact that the assistant state's attorney was an experienced, trained lawyer. He indicated he understood that his custody status would limit his ability to prepare his defense, and he responded in the affirmative when asked if he understood that "[t]he Public Defender's Office is appointed to represent defendants who cannot afford a lawyer" and that "the Public Defender's Office has the ability and the power to decide who gets assigned to which cases."

¶ 9    Defendant volunteered that his desire to represent himself was based on a disagreement with his appointed lawyer. The trial court explained that disagreements take place between lawyers and criminal defendants on a regular basis and asked again if the defendant wished to represent himself. Defendant answered in the affirmative, and the trial court said, "Defendant may represent himself."

¶ 10    At no point during the proceedings that day did the trial court inform defendant of (1) the nature of the charges against him, (2) the minimum and maximum sentence prescribed by law, and (3) his right to counsel.

¶ 11    Trial commenced on January 24, 2020. Before proceeding to jury selection, the State announced that it was proceeding on counts V and VI of the indictment, dismissing counts I, II, III, and IV. In the very next sentence, the trial court said, "just so you're aware, the state charged

you with six different counts of murder, but they're proceeding on three specific counts." The trial court told defendant the State was proceeding on the counts that alleged that, during the commission of the offense, defendant personally discharged a firearm that proximately caused death.

¶ 12    Following jury selection, defendant moved the trial court to dismiss his case for a violation of Illinois's speedy trial statute. However, before argument on that motion commenced, an attorney apparently inserted himself into the proceedings. Though the record is somewhat unclear, it appears this attorney entered the courtroom after *voir dire* and gave defendant a written motion to dismiss. The following exchange took place:

"THE COURT: Okay, Mr. Stewart, anything you want to add outside of—

no, Mr. Jackson. This is not going to be allowed.

MR. JACKSON: It's important—I'm not going to—

THE COURT: No, Mr. Jackson, completely inappropriate that you are

sitting behind the defendant who is representing himself, completely inappropriate,

completely inappropriate.

MR. JACKSON: Judge, if he likes me as a standby. Would you like me as

your standby counsel.

DEFENDANT: That's fine.

THE COURT: No, Mr. Jackson.

MR. JACKSON: I just want to make the record here. I'm prepared to file

my appearance—limited appearance for purposes of this motion in particular. Now,

you're denying him the right to have—

THE COURT: I already denied it.

MR. JACKSON: I understand that, Judge. I understand.

THE COURT: Okay.

MR. JACKSON: But I'm just making my record.

THE COURT: Okay.

MR. JACKSON: And I prepared—I drafted the motion.

THE COURT: Okay."

¶ 13 Following additional discussion about the speedy trial issue, counsel said, "With that I'll leave." The trial court replied:

"Thank you. Mr. Jackson, thank you. As a friend of the Court I will accept that you walked into this courtroom after jury was selected and handed what you now acknowledge to be a document and motion you prepared when you are not the attorney of record when Mr. Stewart has decided to represent himself."

¶ 14 Defendant's motion was denied, and the trial proceeded.

¶ 15 B. Trial Evidence

¶ 16 Responding to a 911 call on the evening of January 1, 2018, Chicago police officers discovered Reed's lifeless, frozen body face down in the snow in an alleyway at 81st Street and Stony Island Avenue. A single .45-caliber bullet had penetrated Reed's left temporal bone and left temporal lobe before coming to rest in the right temporal lobe, precipitating his death. Scorch marks on Reed's left temple indicated that the gun responsible for his death was fired mere inches away. There were tire tracks and footprints around Reed's body, but no shell casings were recovered.

¶ 17    Three days later, defendant phoned Reed's grandmother, Dorothy Reed, insistent that he wished to tell her what happened with her grandson and that no one else wanted to listen. He informed her that he attended a New Year's Eve Party with Reed and that afterward he dropped Reed off around 79th Street and Stony Island Avenue.

¶ 18    Chicago police detectives recovered security footage from both ends of the alley from which Reed's body was recovered. Footage from one end showed a dark, four-door sedan with a broken driver's side taillight pull into the alley. Approximately two minutes later, the vehicle exited the alley and pulled onto the street. Detectives learned that defendant drove a black 2008 BMW sedan with four doors that was registered in his name.

¶ 19    Detectives located defendant's BMW at 77th Street and Coles Avenue on January 10, 2018, at 10 p.m. A visual inspection with a flashlight from outside the vehicle revealed what appeared to be numerous bloodstains throughout the interior of the vehicle. The vehicle was towed and impounded.

¶ 20    Additional investigation led detectives to an apartment located half a block from where defendant's car was seized. The unit's lease contract belonged to Yasmeen Zuri, defendant's ex-girlfriend. The two moved into the apartment in October 2017, but she moved out the following month. As of December 2017, defendant was still living in the apartment.

¶ 21    A search of that apartment yielded a blue jacket, a V-neck T-shirt, jeans, and black boots, as well as a container of "bubble scrub" and an air freshener, all of which appeared to be stained with blood. Additionally, a fired bullet and a spent shell casing were recovered from a drawer. On February 2, 2018, after defendant's car was released back into his possession, defendant was stopped by Chicago police because one of his taillights was not functioning.

¶ 22    Forensic analysis eventually confirmed that the stains inside defendant's car were blood and that Reed's DNA was present throughout those stains. Defendant's DNA, however, was excluded from every sample taken from the car save for a bloodstain swab taken from the passenger seat. Defendant was included in that sample as a minor donor, but the frequency of that minor DNA profile in the general population was as high as one in three people.

¶ 23    Likewise, the articles of clothing recovered from Zuri's apartment were confirmed to be stained with blood, and the coat, shirt, and jeans contained Reed's DNA. Defendant's DNA profile, however, was excluded from those articles of clothing.

¶ 24    Forensic analysis of the bullet that killed Reed and the bullet found in Zuri's apartment indicated that both bullets were fired from the same gun. No weapon was ever recovered. Particles consistent with gunshot residue were found on one of the cuffs of the blue jacket.

¶ 25    On June 30, 2018, defendant visited Zuri in Downers Grove. While sitting on a bench, and after removing the battery and SIM card from his phone, he confessed to her that he shot someone in the head and that he contemplated shooting the person a second time while he waited 10 minutes for the person to die.

¶ 26    Defendant testified in narrative form that Reed was a close friend of 12 years and that he cooperated with the investigation and did not try to hide anything. He did not know how Reed's blood ended up inside his car and claimed that the blood was not inside the car when he was still driving it following Reed's death.

¶ 27    Defendant and Reed both attended a New Year's Eve party at 6253 South Michigan Avenue. Defendant admitted that still photographs from the building's surveillance cameras showed him greeting Reed in the building's lobby, but he also contended that he did not remember

doing so. He later left the party with Reed after someone else asked him to give Reed a ride, but he could not recall what time they left. Defendant admitted that the security footage of him inside the building where he attended the party showed him wearing a red hat, a blue jacket with a collar, jeans, a white T-shirt, and dark shoes.

¶ 28    The jury found defendant guilty of first degree murder.

¶ 29                                C. Posttrial Proceedings

¶ 30    Defendant filed a *pro se* motion for a new trial on February 24, 2020. At defendant's request, after he asserted that the trial court denied him "assistant counsel," the trial court appointed counsel to represent defendant for the purposes of his posttrial motion.

¶ 31    Defense counsel filed his own motion for a new trial on August 18, 2020, as well as a supplemental motion for a new trial on January 6, 2021. Neither motion alleged the trial court's failure to admonish defendant pursuant to Rule 401(a).

¶ 32    Those motions were denied on March 9, 2021. The trial court then *sua sponte* raised the fact that it had failed to admonish defendant about the sentencing range for first degree murder when it allowed defendant to represent himself. Defense counsel then filed an amended supplemental motion for a new trial on April 28, 2021, claiming that the trial court failed to substantially comply with Rule 401(a).

¶ 33    On June 1, 2021, the trial court denied the amended supplemental motion for a new trial. The trial court reasoned, "I don't find that persuasive because you represented him. I am sure you told him what the charge was. He was very aware throughout this case what his charge was." Nearly two years after defendant waived his right to counsel, the trial court found that defendant's

waiver was proper, reasoning, "Just because I didn't say certain words doesn't automatically mean that the defendant didn't do what he wanted to do."

¶ 34                                    II. ANALYSIS

¶ 35                        A. Compliance with Supreme Court Rule 401(a)

¶ 36    The issue before us is not whether defendant was able to "do what he wanted" but whether his decisions about what he wanted were made knowingly and intelligently. Defendant claims that the trial court failed to admonish him regarding (1) the nature of the charges against him and (2) the possible penalties of those charges and that his waiver of counsel thus was not made knowingly and intelligently. Reviewing *de novo*, we agree. See *People v. Washington*, 2016 IL App (1st) 131198, ¶ 50.

¶ 37    Both the United States and Illinois Constitutions guarantee the right to counsel at every critical stage of a criminal prosecution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. "[R]ecognizing the enormous importance and role that an attorney plays at a criminal trial, we have imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to counsel at trial." *Patterson v. Illinois*, 487 U.S. 285, 298 (1988). To that end, an accused may waive his constitutional right to counsel as long as the waiver is voluntary, knowing, and intelligent. *Haynes*, 174 Ill. 2d at 235. The requirement of a knowing and intelligent choice " 'calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 42 (quoting *People v. Lego*, 168 Ill. 2d 561, 564 (1995)).

¶ 38    In Illinois, Rule 401(a) governs the trial court's acceptance of an accused's waiver of counsel, and compliance with Rule 401(a) is required for an effective waiver. *Haynes*, 174 Ill. 2d at 235-36. The rule states:

> "(a) Waiver of Counsel. Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> (1) the nature of the charge;
>
> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
>
> (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 39    Strict, technical compliance with Rule 401(a) is not always required. *Haynes*, 174 Ill. 2d at 236. Substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily and if the admonishment the defendant received did not prejudice his rights. *Id.* Each waiver must be assessed on its own particular facts. *Id.* at 242.

¶ 40    As one preliminary matter, the State claims that defendant failed to preserve this issue because he did not make a contemporaneous objection to the trial court's lack of admonishments. We think it would be absurd to require a defendant to preserve the denial of his right to counsel by objecting to the absence of admonishments meant to safeguard that same right.

¶ 41    Nevertheless, whether defendant preserved this issue is irrelevant because the absence of an effective waiver of counsel has consistently been treated as a serious error that warrants second-prong plain-error review. See, *e.g.*, *People v. Seal*, 2015 IL App (4th) 130775, ¶ 26 (collecting cases); *People v. Jiles*, 364 Ill. App. 3d 320, 328 (2006); *People v. Nemec*, 2019 IL App (2d) 170382, ¶ 16; *People v. Moore*, 2021 IL App (1st) 172811, ¶ 12.

¶ 42    It must also be noted at the outset that, although not raised by defendant, the trial court did not admonish defendant specifically of his right to counsel at the time of his waiver. Instead, it only informed him that "[t]he Public Defender's Office is appointed to represent defendants who cannot afford a lawyer" and that "the Public Defender's Office has the ability and power to decide who gets assigned to which cases, I don't."

¶ 43    We cannot turn a blind eye to the fact that informing defendant that appointed counsel is available to represent him is a far cry from informing him that he has a constitutional *right* to counsel and a constitutional *right* to appointed counsel if indigent. See *Washington*, 2016 IL App (1st) 131198, ¶ 49 ("When a defendant expresses a desire to proceed without counsel, the defendant is entitled to be advised of his or her right to the assistance of counsel, as well as the right to self-representation."). Thus, the absence of this admonishment must also be considered here.

¶ 44    With those preliminary issues acknowledged, we can proceed to the heart of the matter. There is no denying that examples of substantial compliance with Rule 401(a) abound throughout our precedent. These examples, including many of those cited by the State, conform to a common theme of imperfect or incomplete admonishments saved by a record that otherwise demonstrates a knowing and intelligent waiver of counsel. See, *e.g.*, *People v. Wright*, 2017 IL 119561, ¶¶ 52-

56; *Haynes*, 174 Ill. 2d at 238, 240; *People v. Coleman*, 129 Ill. 2d 321, 333-34 (1989); *People v. Johnson*, 119 Ill. 2d 119, 132 (1987); *People v. Phillips*, 392 Ill. App. 3d 243, 262-64 (2009).

¶ 45    Those are not the circumstances in which we find ourselves here. Instead, we are confronted with a complete failure to comply with the dictates of Rule 401(a)—the plain language of which requires the trial court to address the defendant in open court *at the time of the waiver*, inform the defendant of the three listed items, and determine that he *understands* them. Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 46    This court recently grappled with the complete failure of the trial court to provide the required Rule 401(a) admonishments. See *Moore*, 2021 IL App (1st) 172811, ¶¶ 12-37. It was unable to find any examples where a court has found substantial compliance with the rule when no admonishments whatsoever were given. See *id.* In the two years since *Moore*, that has not changed, nor should it change now.

¶ 47    The State's argument asks us to piece together substantial compliance by way of fragmented bits of information present throughout the record, such as defendant's bond hearing, arraignment, his *pro se* pretrial motions, and a jail phone call that took place six months after defendant waived counsel. We cannot do so.

¶ 48    Defendant's pretrial motions only reference that he was charged with first degree murder and say nothing of the 25-to-life firearm enhancement. Likewise, defendant's bond hearing and arraignment, which took place approximately 11 months and 10 months before defendant waived counsel, respectively, did not provide a full accounting of the nature of the charges and the possible penalties.

¶ 49    Even if those court dates did provide all the information required by Rule 401(a), which they did not, they nevertheless cannot account for the attenuation between the court dates and when the defendant invoked his right to represent himself on June 25, 2019. "Prior admonishments and defendant's decision to discharge counsel do not somehow cause defendant to forgo the right to be fully informed of the ramifications of acting on his own behalf." (Internal quotation marks omitted.) *Seal*, 2015 IL App (4th) 130775, ¶ 31. Indeed, "[d]efendant cannot be expected to rely on admonishments given months earlier, when he was not requesting to waive counsel." *Jiles*, 364 Ill. App. 3d at 329-30.

¶ 50    Likewise, we cannot accept the State's reliance on events that took place approximately six months *after* defendant proceeded *pro se*. Rule 401(a) requires that defendant understand his rights and the nature of the charges at the time his waiver is made. Ill. S. Ct. R. 401(a) (eff. July 1, 1984). This, of course, is intended to ensure that a defendant can consider the potential ramifications of his choice at the time. *Washington*, 2016 IL App (1st) 131198, ¶ 49. Even if the events that took place six months after defendant's waiver fully supplied defendant with the information required by Rule 401(a), it does not establish that he knew and *understood* that information at the time of the waiver. This argument also ignores the significance of time and preparation. Even if defendant learned of the enhancement the day of trial, and even if that was sufficient, we are forced to ask: so what? The die was already cast. No amount of understanding would make up for the fact that defendant was *pro se* during the six months when counsel could have been litigating pretrial motions and preparing a defense.

¶ 51    The State also insists that defendant displayed "a relatively sophisticated understanding of courtroom procedure as evidenced by his pretrial filings, his participation in *voir dire*, and his

success in barring certain evidence at trial." We cannot agree with this generous interpretation of the record. Throughout the time he represented himself, defendant repeatedly demonstrated a misguided understanding of basic courtroom procedure and the law.

¶ 52    While this is certainly not an exhaustive list: defendant did not know how or why to file an answer. He did not understand the basic purpose of opening statements. He did not object to considerable amounts of evidence admitted through leading questions, which, at one point, caused the trial court to intervene on defendant's behalf. He did not know how to impeach witnesses and had clearly planned part of his defense under the misapprehension that successfully impeaching a witness should result in certain evidence against him being stricken or excluded. He willingly surrendered the opportunity to examine surveillance videos, witness statement videos, and jail recordings because he had written reports. He misunderstood the meaning of a motion to exclude witnesses and expected the State to tell him which witnesses it would call on which day so he could prepare. The list goes on and on.

¶ 53    We simply cannot and will not assume from bits and pieces of the record that defendant sufficiently understood his right to counsel and the nature of the consequences he was facing to knowingly and intelligently waive his sacred right to counsel.

¶ 54    "There must be limits to the notion of 'substantial compliance.' " *Moore*, 2021 IL App (1st) 172811, ¶ 31. While we need not circumscribe the full extent of those limits here, it is no stretch to say that those limits must include situations where the trial court completely fails to provide the required admonishments.

¶ 55    As *Moore* pointed out, yes, it is possible, and perhaps even likely, that *pro se* defendants may eventually acquire the information required by Rule 401(a)'s admonishments at some point,

a piece here, a piece there. *Id.* ¶ 33. But if we allow that to suffice completely in lieu of Rule 401(a) admonishments, "then what is left of Rule 401? Nothing, essentially." *Id.* ¶ 31. Whatever the rationale for tolerating substantial compliance with a simple rule, rather than insisting on strict compliance, it cannot be because we are comfortable obliterating Rule 401(a) entirely or condemning it to irrelevance.

¶ 56    The phrase "substantial compliance" cannot be magic words that permit us to alleviate the trial court of its Rule 401 obligations, and then burden us with the task of cobbling together a knowing and intelligent waiver from circumstantial or speculative evidence scattered throughout the record and across multiple years. Rule 401(a) contains the mandatory language "shall" and its prescriptions are not aspirational. Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 57    While Rule 401(a) is intended to insure that only knowing and intelligent waivers of counsel are accepted, it seems evident that it also was intended to prevent situations like the one in which this court now finds itself. With thorough admonishments and a colloquy that clearly shows that defendant understood his rights, the charges against him, and the possible penalties, we would not need to speculate from a cold record about what defendant knew and when he knew it.

¶ 58    The right to counsel should never be lightly deemed waived. *Washington*, 2016 IL App (1st) 131198, ¶ 45. This was a complicated case involving the admission of numerous videos, cellular tower evidence, DNA evidence, and ballistics evidence. Defendant was charged with the gravest crime we recognize and facing the most severe punishment we administer. We do not arbitrarily regard certain rights as fundamental; we do so because they are the bedrock upon which our system of justice is built. The right to counsel is of particular importance because of its role in preserving the free exercise of other constitutional rights. *People v. Heral*, 62 Ill. 2d 329, 336

(1976). To permit complete noncompliance with Rule 401(a) here would see us preside over the erosion of a sacred right.

¶ 59    We cannot find compliance with Rule 401(a), actual or substantial, when the trial court fails entirely to provide the required admonishments. *People v. Campbell*, 224 Ill. 2d 80, 84 (2006); *Moore*, 2021 IL App (1st) 172811, ¶ 36.

¶ 60                        B. Other Issues That May Recur on Retrial

¶ 61    Defendant also claims that (1) the trial court abused its discretion by failing to appoint standby counsel, (2) he was denied his due process right to a fair trial where the trial court failed to order a behavioral clinical examination and hold a fitness hearing, and (3) he was denied a fair trial where the State shifted the burden of proof during closing arguments. Because we are remanding for a new trial, we address these issues below.

¶ 62                        1. Appointment of Standby Counsel

¶ 63    Because defendant could conceivably waive his right to counsel upon remand, such that the question of standby counsel may again become relevant, it behooves us to address this issue in some capacity. Reviewing whether the trial court abused its discretion, we hold that the trial court did not.

¶ 64    While the United States and Illinois Constitutions grant an accused the right of self-representation, the appointment of standby counsel to assist a *pro se* defendant does not offend those rights. *People v. Gibson*, 136 Ill. 2d 362, 374-75 (1990). Relevant criteria appropriately considered by the trial court in deciding whether to appoint standby counsel include (1) the nature and gravity of the charge, (2) the expected factual and legal complexity of the proceedings, and (3) the abilities and experience of the defendant. *Id.* at 380. However, the right of self-

representation does not carry with it a corresponding right to legal assistance. *People v. Parker*, 335 Ill. App. 3d 474, 484 (2002) (citing *People v. Simpson*, 204 Ill. 2d 536, 562 (2001)). A defendant who chooses to represent himself must be prepared to do just that. *Id.*

¶ 65    Defendant insists that he requested the appointment of standby counsel on January 24, 2020. We do not find that the record supports that claim. Attorney Jackson certainly sought to insert himself into the proceedings, and defendant expressed a tacit willingness to accept that assistance by claiming, "That's fine." But defendant himself never made such a request, which we find to be significant. See *id.* at 486 (emphasizing that defendant never requested the appointment of standby counsel prior to or during trial). As it stands, the trial court was confronted with a scenario where an attorney came into a jury trial in progress, gave defendant a motion to file that he had drafted, despite defendant's self-representation, and volunteered to insert himself into the proceedings.

¶ 66    Moreover, defendant's claim is that the trial court erred by not allowing standby counsel to assist for the entirety of the trial. Even if counsel's offer to assist could somehow be construed as a request made by the defendant, we would still find no error because counsel was explicit that his offer was to assist only for the limited purpose of the motion to dismiss. Thus, the trial court was never confronted with a request to appoint standby counsel to assist defendant for the entirety of the trial. Notwithstanding that, if the trial court did not abuse its discretion in refusing to appoint standby counsel in a first degree murder case right as trial was set to begin, it is well within the discretion of the trial court to refuse to appoint standby counsel on a case that was already underway. See *People v. Pratt*, 391 Ill. App. 3d 45, 50 (2009).

¶ 67 There is no doubt that this was a serious case, as well as a complex one. And as we noted earlier, defendant's familiarity with criminal procedure was minimal, at best. Nevertheless, it would seem odd to say that the trial court abused its discretion by failing to do a thing it was never asked to do and was not obligated to do.

¶ 68 Accordingly, the trial court did not abuse its discretion by refusing to appoint standby counsel.

¶ 69 2. Behavioral Clinical Examination and Fitness Hearing

¶ 70 Because we are remanding for a new trial, the question of whether defendant was denied his due process right to a fair trial because the trial court did not order a behavioral examination is one we need not answer.

¶ 71 Though we do not comment on whether the trial court should have ordered a behavioral clinical examination, it is axiomatic that the trial court remains obligated to determine defendant's fitness if a *bona fide* doubt as to defendant's fitness arises upon remand. 725 ILCS 5/104-11(a) (West 2020).

¶ 72 3. The State's Comments in Closing Argument

¶ 73 Defendant finally claims that the State shifted the burden of proof in closing argument when it argued that defendant never told the jury he did not commit the murder. Given the evidence in this case, it is conceivable that similar evidence may be received upon retrial, giving rise to a similar closing argument. Thus, this issue warrants some resolution.

¶ 74 The parties agree that this error was not properly preserved, but defendant claims that this issue can nevertheless be reviewed under plain error. However, invocation of the plain-error doctrine first requires that we find that a clear or obvious error occurred. *People v. Piatkowski*, 225

Ill. 2d 551, 565 (2007). The comment of which the defendant complains did not constitute a clear or obvious error, let alone any error at all, and thus relief is not warranted.

¶ 75    A defendant is entitled to a fair trial free from irrelevant evidence and prejudicial comments by the State. *People v. Wheeler*, 226 Ill. 2d 92, 121-22 (2007). Closing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context. *Id.* at 122. Prosecutors are afforded wide latitude in closing argument, and the question is whether the State's comments engendered substantial prejudice against a defendant such that it is impossible to say whether a verdict of guilt resulted from them. *Id.* at 123. Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction. *Id.* If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that a prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. *Id.*

¶ 76    It is improper for the State to shift the burden of proof. *People v. Yonker*, 256 Ill. App. 3d 795, 800 (1993) However, once a defendant has presented certain evidence, it is not beyond the reach of appropriate comment by the prosecution. *People v. Phillips*, 127 Ill. 2d 499, 527 (1989). "There is a great deal of difference between an allegation by the prosecution that defendant did not prove himself innocent and statements questioning the relevance or credibility of a defendant's case." *Id.*

¶ 77    Relying on *Wheeler*, defendant asserts that our standard of review for this issue is *de novo*, and the State does not dispute this assertion or offer an alternative. See *Wheeler*, 226 Ill. 2d at 121. This has been a topic that has engendered substantial debate. This court has, on occasion, acknowledged some confusion regarding the appropriate standard of review to be applied to claims

of improper remarks from a prosecutor. See, *e.g.*, *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 39 (comparing *de novo* standard found in *Wheeler*, 226 Ill. 2d at 121, with abuse of discretion standard found in *People v. Blue*, 189 Ill. 2d 99, 128 (2000)). On other occasions, this court has asserted that there is no confusion and instead reasoned that *Blue*'s abuse of discretion standard pertains to the trial court's determinations about a prosecutor's conduct, while *Wheeler*'s *de novo* standard concerns the legal issue of whether a prosecutor's comments were so egregious that they warranted a new trial. See, *e.g.*, *People v. Cook*, 2018 IL App (1st) 142134, ¶ 64. We need not engage in this debate further here because, regardless of what standard of review we apply, the State's comments were proper and did not constitute error.

¶ 78    The following is the section of argument that defendant claims shifted the burden of proof to him:

"The whole time that he was up there and he got up and he had free rein to tell you his story on his own direct examination of sorts, not once did he say, I didn't do it, did he? When I cross-examined him, did he ever say, I didn't do it? No. He said nothing.

And then the judge said, Do you have anything that you want to say in response to cross? Did he say, I didn't do it? Did he start to cry for his friend that he smirked about earlier in his testimony? He said nothing."

¶ 79    We do not agree with defendant that this constituted impermissible burden shifting. Instead, it was a fair comment on the credibility of defendant's testimony. The State's comments were not directed at whether defendant was required to explicitly deny shooting Reed. Defendant claimed on cross-examination that Reed was attempting to go to another party, that defendant did not intend to accompany Reed, and that defendant dropped Reed off at the second party. The State

was merely commenting on the fact that, although defendant gave an accounting of what happened to Reed that night, he never explicitly denied shooting Reed despite multiple opportunities to address the jury in narrative form. We need not comment on the persuasiveness of that argument other than to say that it was a fair comment on the credibility of defendant's defense.

¶ 80    Furthermore, examining the overall context of the challenged comments lends further support for this position. On cross-examination, defendant claimed that he dropped Reed off at another party, but he could not remember where or at what time, nor could he remember what time he left the first party with Reed. Just prior to the challenged comments, the State said:

> "When he testified, he said he didn't remember dropping Jaquan off. He doesn't remember anything—or anything after New Year's Eve except for then going home. So, by his own admission, he could have killed Jaquan and he just doesn't remember."

¶ 81    In context, the gist of the State's argument was that defendant's account of what happened was false, underscored by the fact that he never explicitly denied killing Reed. When viewed with some of the other evidence, such as defendant's statement to Zuri that he had killed someone and watched them die, defendant's lack of an explicit denial was a proper comment on his credibility.

¶ 82    Moreover, we do not find that the challenged comments improperly invoked the authority of the trial court or misstated the evidence.

¶ 83    Accordingly, we find no error with the challenged comments, let alone plain error.

¶ 84                    III. SUFFICIENCY OF THE EVIDENCE

¶ 85    Because we are remanding for a new trial, we are required to consider for double jeopardy purposes whether the evidence was sufficient to sustain defendant's conviction beyond a reasonable doubt. *Jiles*, 364 Ill. App. 3d at 330-31. Double jeopardy typically prohibits a second

or successive trial for the purpose of affording the prosecution another opportunity to supply evidence it failed to muster in the first proceeding. *Id.* at 331. Double jeopardy does not preclude retrial of a defendant whose conviction is supported by sufficient evidence but set aside because of errors in the trial process. *Id.* The evidence is sufficient when a rational trier of fact, after viewing the evidence in the light most favorable to the State, could find that the essential elements of the offense were proven beyond a reasonable doubt. *Id.*

¶ 86　The crime of first degree murder, as charged in this case, is defined as follows:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1(a)(1), (2) (West 2018).

¶ 87　The State also proceeded under the theory that defendant, during the commission of the offense, personally discharged a firearm that proximately caused the death of Reed, which carries a mandatory enhancement of 25 years in prison up to natural life. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020).

¶ 88　Here, viewing the evidence in the light most favorable to the State, we cannot say that a rational trier of fact could not find all of the elements proven beyond a reasonable doubt.

¶ 89　Although the trial evidence was summarized above, we reiterate a few of the more significant facts here. Defendant was filmed leaving a building with Reed on New Year's Eve. The same night, a vehicle matching the description of defendant's BMW was seen entering and exiting

the alley where Reed's body was found. The interior of defendant's BMW and the clothes recovered from Zuri's apartment, which appeared to match the clothes defendant was wearing that night, were covered with Reed's blood. The bullet that killed Reed was fired from the same weapon that fired the bullet recovered from Zuri's apartment, where defendant was living at least up until December 2017. Finally, there was defendant's statement, admitted through Zuri, that he had shot someone and watched them die for 10 minutes.

¶ 90    Because a rational trier of fact could have found all the elements proven beyond a reasonable doubt, retrial will not violate double jeopardy principles.

¶ 91                                    IV. CONCLUSION

¶ 92    We reverse defendant's conviction and remand for a new trial.

¶ 93    Reversed and remanded.

---

***People v. Stewart*, 2023 IL App (1st) 210912**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-11933; the Hon. Ursula Walowski, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Stephen L. Gentry, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Noah Montague, and Erin K. Slattery, Assistant State's Attorneys, of counsel), for the People. |

---